741 So.2d 520 (1999)
ASSOCIATION FOR RETARDED CITIZENS-VOLUSIA, INC., etc., Appellant,
v.
Sandra FLETCHER, etc., Appellee.
No. 98-879.
District Court of Appeal of Florida, Fifth District.
June 18, 1999.
Sharon Lee Stedman of Sharon Lee Stedman, P.A., Orlando, for Appellant.
Kimberly Sands of Sands, White & Sands, P.A., Daytona Beach, for Appellee.
*521 ANTOON, J.
The Association for Retarded Citizens-Volusia, Inc. (ARC), is a nonprofit organization that has provided services and programs to persons with developmental disabilities in Volusia County since 1962. ARC sponsors numerous programs and provides services ranging from developmental training, employment assistance, residential care, and social services. One of the programs sponsored by ARC is a summer camp.
Nathan Wiley suffered a seizure and aspirated water while swimming in a pool at a summer camp operated by ARC. He later died as a result of respiratory complications. Nathan's mother Sandra Fletcher, as personal representative of Nathan's estate and individually, sued ARC alleging negligence and was awarded damages for Nathan's wrongful death. ARC appeals the final judgment contending that the trial court erred by 1) entering partial summary judgment prohibiting ARC from pleading and arguing to the jury that the alleged negligence of medical providers who treated Nathan following the swimming accident resulted in his wrongful death, and 2) denying its motion for judgment notwithstanding the verdict on grounds that Ms. Fletcher failed to establish that ARC had breached any duty of care. We affirm.
In 1992, Ms. Fletcher arranged for Nathan to attend the ARC summer camp as a day camper. The camp was located at the Central Baptist Youth Camp near the Ocala National Forest and was operational from July 27 until August 1. Nathan was seventeen years old at the time. He had a severe developmental disability and suffered grand mal seizures. In completing the camp application, Ms. Fletcher indicated that Nathan suffered from grand mal seizures and was taking prescription medication for this condition. Although this information was included in the application, it was not shared with Nathan's camp counselor or the pool lifeguards. The application did not question, nor did any camp employee ask, Ms. Fletcher when Nathan's last seizure had occurred or to what extent the seizures were controlled by the medication. Nonetheless, ARC's camp employees were aware that it is not unusual for persons with developmental disabilities to experience seizures and that even those persons whose disorders are "controlled" are likely to experience "breakthrough" seizures.
Upon arrival the campers were divided into various groups. Nathan was one of fourteen boys and thirteen girls who comprised the "blue group." The blue group was further divided for supervision purposes; the boys were divided into two groups of seven, and the girls into one group of seven and one group of six. Each of these smaller groups was supervised by a counselor. The groups rotated through the various camp activities including use of the swimming pool.
During pool activities, the counselors were in the pool with the campers and were required to "watch them, stay with them, and realize that they're in the water." A lifeguard was also on duty and had the responsibility of watching the campers while they were in the pool in addition to placing drops in their ears as they exited the pool. Only two members of the blue group (Dara and Dexter) were permitted to swim in the deep end of the pool. The others, including Nathan, were required to remain in the shallow end of the pool. Such precautions were necessary because swimming can be a hazardous activity for persons with developmental disabilities. During a seizure, a person could lose voluntary muscle control including control over the ability to keep his head above water or to hold his breath. Such loss of control could also result in the inhalation of amounts of water sufficient to cause drowning or near drowning. Those who survive inhalation of significant amounts of water are also at risk of developing Adult Respiratory Distress Syndrome ("ARDS"), a condition which often results in death.
*522 On July 28, 1992, the blue group was completing its forty-five-minute pool period and a group of girls had already exited the pool. The lifeguard was on the deck at the shallow end administering ear drops, and two counselors, including the one supervising Nathan, were at the rope between the shallow and the deep ends of the pool. At this point, the counselor who was assigned to supervise Nathan decided to "stretch out" and swim to the deep end of the pool to speak to Dara. The other counselor then began to move from one side of the pool to the other watching his campers, all of whom remained in the shallow water. No one saw Nathan as he crossed under the rope to a point in the deep end of the pool.
While speaking to Dara, Nathan's counselor noticed that Nathan was face down in the deep end of the pool approximately thirty feet from where he had last seen him. According to the counselor, Nathan appeared to be in trouble because he was "jerking around." The counselor shouted to the other counselors, then dove in and pulled Nathan to the surface. When he was removed from the water Nathan did not appear to be breathing, but the lifeguard was able to resuscitate him. After Nathan regained consciousness, he was transported by ambulance to the Halifax Medical Center in Daytona Beach.
When he arrived at the medical center's emergency room Nathan was confused and aggressive. Examination revealed that he had aspirated a significant amount of water which had severely damaged his lungs. Nine days after he was admitted to the hospital, Nathan died. The cause of his death was ARDS.
Ms. Fletcher filed this lawsuit alleging that ARC's negligence was the proximate cause of Nathan's death. ARC answered the complaint denying liability and asserted the affirmative defense that Nathan's wrongful death was caused by the negligent medical care provided to him after the swimming accident. Approximately six months before trial, Ms. Fletcher moved for summary judgment on ARC's affirmative defense contending that, as a matter of law, the defense was inapplicable because the allegedly negligent care providers "are not joint tortfeasors with the Defendants." Ms. Fletcher argued that the Florida Legislature's 1991 statutory abrogation of the common law theory of joint and several liability in favor of the allocation of fault among tortfeasors was not intended to apply to medical professionals who subsequently provided negligent treatment aggravating a plaintiffs initial injury.[1] In response, ARC filed a *523 memorandum in support of their affirmative defense and a motion to add third parties to the verdict form. This motion listed EMS, Halifax Hospital, and four physicians who allegedly treated Nathan after the swimming accident. After conducting a hearing on the matter, the trial court entered summary judgment in favor of Ms. Fletcher thereby prohibiting ARC from pleading, proving, or arguing that the medical providers who treated Nathan after the accident negligently aggravated his injuries.
At trial, ARC urged the trial court to reconsider its summary judgment ruling. The trial court agreed and allowed ARC to proffer testimony in support of its affirmative defense. The proffer consisted of the testimony of ARC's two expert witnesses regarding the allegedly negligent act of transporting Nathan to Halifax Medical Center instead of a medical facility which was located closer to the day camp. However, neither expert testified that it was more likely that Nathan would have survived the swimming accident had he been transported to a closer hospital.
In that regard, ARC proffered the testimony of Dr. Greenspan in support of its affirmative defense. With regard to whether Nathan's death was caused by the swimming accident or subsequent medical negligence, Dr. Greenspan testified:
A. The die is cast in some sense, he aspirated. Whatever damage was going to be done to some extent was going to be done. Yet medically you want to try to intervene and support that as soon as possible.
If they had gotten him to a facility an hour earlier, half hour earlier, diagnosis would have been quicker, treatment would have been quicker.
Would that have affected how ill he was? Would that have affected his hospital course? I don't know the answer to that. The probability, and I don't think anybody knows, but the probability, in my view, is if he had gotten to that same hospital a little earlier, his outcome may not have been any different. But could it have possibly been different? Yes, it could possibly have been different. I don't know that.
Q. What I need to know, more likely than not that it would have been different, would it probably have been?
A. I would say it probably would not have been.
Q. Okay, and that is because of the seriousness of the injury he suffered in the pool?
A. Correct.
This testimony does not establish that negligent medical care contributed to Nathan's death. This was not the only evidence the trial court considered in making its ultimate ruling. ARC also proffered the deposition testimony of Drs. Purandare, Wahba, and Reeves regarding the effect of the initial injury.
Dr. Purandare testified that it was not a surprise that Nathan died because his level of lung injury was quite severe, and that there is nothing that you can do to prevent adult respiratory distress syndrome after someone has inhaled water. Similarly, Dr. Wahba testified that there is no specific treatment for respiratory distress syndrome stating that "[t]he only thing you can do for ARDS is support, meaning give him oxygen, put them on a ventilator, watch them on a daily basis and support them. There's no specific treatment. It carries an extremely high mortality." (Emphasis added). Finally, Dr. Reeves stated that a near drowning is a medical emergency and that the patient should be taken to a hospital, but he did not state whether or not Nathan should have been taken to a hospital located closer to the camp than Halifax. He stated that the *524 decision where to take a patient depends on a number of factors, including which hospital is best equipped to handle the specific emergency. He was not able to render an opinion because he was not familiar with the protocols for the area's emergency medical units. Dr. Reeves also stated that he was not aware of any known treatment for respiratory distress syndrome.[2] After hearing the experts' testimony, the trial court let the earlier summary judgment ruling stand.
ARC urges us to decide this case by resolving the underlying legal issue of whether an initial tortfeasor can defend against a claim of negligence by pleading and proving that the plaintiff's initial injury was aggravated by subsequent negligent medical treatment. However, we need not decide this issue because the result in the instant case is the same regardless of which way this legal question would be decided. More specifically, even if we were to agree with ARC that, as a matter of law, an initial tortfeasor can defend against a claim of negligence by pleading and proving subsequent medical malpractice, in this case the trial court correctly prohibited the admission of any evidence of medical negligence because ARC failed to proffer any evidence to support its contention that medical negligence contributed to Nathan's death. See Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262, 1264 (Fla.1996)(holding that "defendant has the burden of presenting at trial that the nonparty's fault contributed to the accident in order to include the nonparty's name on the jury verdict.") On this basis, we affirm the trial court's summary judgment ruling. While our disposition of this issue renders further discussion of the underlying legal issue unessential, we write further to explain our view that ARC's legal argument lacks merit.
The core of ARC's argument is that, by enacting section 768.81, Florida Statutes (1991), our legislature changed the well-established common law rule that "[t]he initial tortfeasor is subject to the total financial burden of the victim's injuries, including those directly attributable to a doctor's malpractice." Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So.2d 702, 704 (Fla.1980). Under the common law, a medical provider who aggravates an injury inflicted by the original tortfeasor is not considered to be a joint tortfeasor, but instead, a distinct and independent tortfeasor. See Stuart v. Hertz Corp., 351 So.2d 703, 705 (Fla.1977). As Judge Cowart clearly stated in Rucks v. Pushman, 541 So.2d 673, 675 (Fla. 5th DCA), rev. denied, 549 So.2d 1014 (Fla. 1989):
[T]he original (initial or primary) tortfeasor is liable to the victim not only for the original injuries received as a result of the initial tort, but also for the additional (or aggravated) injuries resulting from the subsequent negligence of the health care providers. This is true although the original tortfeasor and the subsequently negligent health care providers are independent tortfeasors and not joint tortfeasors jointly and severally liable for one common injury.
In our view, this is still good law and there is no support for ARC's position otherwise in either case law or ordinary reasoning.
The legislature's enactment of section 768.81 was intended to abrogate the concept of joint and several liability for purposes of determining noneconomic damages caused by joint tortfeasors. The statute is designed to allocate the percentage of fault among those parties contributing to the accident which caused the plaintiff's initial injury. A fair reading of the statute implies that the language relating to professional malpractice in subsection 768.81(4)(a) refers to those situations *525 where two or more negligent professionals contribute, or act in concert with each other, to cause an initial injury. Had it been the intent of the legislature to abrogate the well-settled common law rule relating to subsequent medical malpractice, the legislature no doubt would have specifically said so.
Further support for our conclusion can be found in case law which has been issued after the statute's 1991 enactment. For example, in Fabre v. Marin, 623 So.2d 1182, 1185 (Fla.1993), overruled on other grounds, Wells v. Tallahassee Memorial Regional Medical Center, Inc., 659 So.2d 249 (Fla.1995), our supreme court stated that "section 768.81 was enacted to replace joint and several liability with a system that requires each party to pay for noneconomic damages only in proportion to the percentage of fault by which that defendant contributed to the accident." (Emphasis added). In the instant case, it obviously cannot be said that subsequent negligent medical treatment contributed to Nathan's swimming accident.
In Emory v. Florida Freedom Newspapers, 687 So.2d 846, 847 (Fla. 4th DCA 1997), the fourth district restated the common law rule that "`the law regards the negligence of the wrongdoer in causing the original injury as the proximate cause of the damages flowing from the subsequent negligent or unskillful treatment thereof, and holds him liable therefore.'" (quoting Stuart, 351 So.2d at 707). The fourth district reaffirmed this principle in Benchwarmers, Inc. v. Gorin, 689 So.2d 1197 (Fla. 4th DCA 1997), a case involving the initial tortfeasors' action against a medical doctor instituted after the original tortfeasor settled the plaintiff's claim. In that case, the court held that "Benchwarmers, as the initial tortfeasor, is subject to the total financial burden of [the plaintiff's] injuries, including those directly attributable to [the doctor's] subsequent malpractice." Id. at 1198. We interpret this language to mean that section 768.81 only applies to those parties who negligently contributed to the infliction of the plaintiff's initial injury, not to medical providers who subsequently aggravated the injury.
ARC is inviting this court to hold for the first time that a defendant in a personal injury lawsuit who is alleged to have negligently caused the plaintiff's initial injury can require the plaintiff to litigate a medical malpractice claim against medical care providers who subsequently treated the injury. We reject this invitation. Perhaps the reason the legislature did not authorize such a procedure is that the policy considerations militating against such a requirement are overwhelming. Some of these policy considerations were discussed in Stuart where Justice Adkins pointed out that such a practice would "confuse and obfuscate" the issue of the original tortfeasor's liability by turning a simple personal injury action into a complex medical malpractice action. 351 So.2d at 706. Furthermore, such a requirement would no doubt lead to the institution of medical malpractice actions which would not have otherwise been filed and which, because of their inherent complexity, require more judicial resources and slow the processing of the case. Ironically, the original tortfeasor would be empowered, not only to decide whether a victim must sue his or her doctor, but also when that suit must be filed. These policy considerations are no less critical today than they were prior to the 1991 enactment of section 768.81. Moreover, in situations such as this, acts of negligence in medically treating an injury are distinct and separate from the acts of negligence that caused the injury. The statute does not require apportionment for these later independent acts of negligence.[3]
*526 Returning to the dispositive claims of error raised on appeal, ARC next argues that the trial court erred in denying its motion for entry of a judgment notwithstanding the verdict. The basis for the motion was ARC's contention that Ms. Fletcher had failed to set forth a standard of care in her case in chief, and made no "showing that [ARC] breached any standard of care in establishing supervision and guidelines for taking care of clients at its summer camp swimming program, including [Nathan]." The record does not support ARC's contentions.
Ms. Fletcher presented a witness who was qualified by the trial court under section 90.702, Florida Statutes (1991), as a person entitled to give opinion testimony "in the field of care and supervision of epileptics in pool situations." This witness testified that swimming is safe for a person with an uncontrolled seizure disorder only if the person supervising is aware of the swimmer's disorder and remains "within arms length of them at all times so that, if they were starting to have a seizure, you could easily reach out to them and keep their head above water so that they wouldn't swallow the water into their lungs." ARC argues that this is not the duty of care that is generally accepted in Florida, and that the proper standard was that standard testified to by ARC's expert. ARC's expert testified that a person who suffers from seizures should be constantly supervised while swimming by a person who knows of the seizure disorder.
First, it was a question for the jury to decide whether ARC properly discharged its duty of care. See Department of Health and Rehabilitative Services v. Yamuni, 529 So.2d 258, 262 (Fla.1988). Second, even under the duty of care described by ARC's expert, Ms. Fletcher presented sufficient evidence demonstrating that ARC was negligent. Ms. Fletcher's evidence demonstrated that ARC's program director knew that Nathan suffered from seizures but failed to inform the lifeguard who was on duty at the time of this incident of Nathan's condition. The lifeguard testified that, in addition to supervising the swimmers, she was responsible for putting drops in the swimmers' ears. Immediately before Nathan was found in the deep end of the pool, the lifeguard was putting drops in a camper's ears. The counselor who was assigned to supervise Nathan testified that he left Nathan in the shallow end of the pool and swam to the deep end to talk to another camper. Only after he had spoken with the other camper did he notice Nathan moving and jerking around under water in the deep end.
A trial court is authorized to grant a motion for judgment notwithstanding the verdict only if there is no evidence or reasonable inferences to support the opposing position. See Stirling v. Sapp, 229 So.2d 850, 852 (Fla.1969). As applied to this case, the trial court did not err in denying ARC's motion for a judgment notwithstanding the verdict because Ms. Fletcher presented evidence that ARC was negligent regardless of whether the jury chose to accept the duty of care proposed by ARC or by Ms. Fletcher.
AFFIRMED.
GOSHORN, J., concurs.
HARRIS, J., dissenting with opinion.
HARRIS, J., dissenting.
The trial court entered a summary judgment prohibiting defendant below from presenting evidence that negligence by others (medical care providers) subsequent to the initial injury contributed to the death of Nathan Wiley because such others were not, in its view, "jointly and severally" liable. This ruling is what appellant claims as error on appeal. The majority instead applies the Tipsy Coachman rule, holding, in effect, that although the trial court was probably right, there's a better reason for the decision. I will first respond to the basis for the trial judge's summary judgment and then discuss *527 why the Tipsy Coachman rule should not be applied in this case.

JOINT AND SEVERAL LIABILITY
The issue in this case, and it is not a new issue, is whether the law requires that one only partially at fault for plaintiff's injury must pay all the damages incurred by plaintiff even if it is possible to apportion the damages among all tortfeasors alleged to be responsible for the injury. The supreme court has expressed concern for some time that it might be unfair to require that each defendant found to be negligent, regardless of its degree of fault, may be required to pay for plaintiff's entire loss. Finally, in Walt Disney World Co. v. Wood, 515 So.2d 198 (Fla.1987), the supreme court, after much discussion and by a close vote, elected to leave the decision on whether to change the law to the legislature. The legislature accepted the challenge and adopted section 768.81, Florida Statutes, entitled "Comparative fault." Subsection (3) of the statute provides that, "In cases in which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability." The legislature then provided in subsection (4)(a) of the statute that the section shall apply to negligence cases which shall include "but is not limited to, civil actions for damages." Appellant herein was sued in this civil action for damages. Clearly, the legislature did not limit its new policy to only those "civil actions for damages" which involve a single injury from one accident.
The legislature has now enacted a state public policy which requires that those found to have committed a negligent act shall be held responsible only to the extent that plaintiffs damages can be attributed to their percentage of fault. Appellee herein concedes that had the healthcare workers sought to be added to the verdict form in this case been "jointly and severally liable," then section 768.81 (and Fabre v. Marin, 623 So.2d 1182 (Fla.1993), receded from in part, Wells v. Tallahassee Memorial Regional Medical Center, Inc., 659 So.2d 249 (Fla.1995)), would have required their inclusion on the verdict form. However, appellee argues, because subsection (3) specifically mentions joint and several liability (by greatly reducing its applicability), this shows that the legislature did not intend that this new policy of limiting liability for damages to defendants' percentage of fault should apply where joint and several liability is not typically involved, as in this case in which consecutive acts of negligence committed by separate tortfeasors are alleged to have contributed to a greater injury.
Appellee's position is that although one is no longer responsible for the share of damages caused by others contributing to a single accident leading to injury, he is nevertheless liable for all the injuries subsequently caused by another's separate and independent act of negligence regardless of his percentage of fault. Think about it. The trial court entered a summary judgment holding that defendant could not "plead, prove or argue that the subsequent negligence of any health care provider contributed" to the young man's death.[1] Suppose in our case, plaintiff had included the health care workers as additional defendants claiming all defendants contributed to cause the death of Nathan. Could not plaintiff have done so? If the health care workers had been joined with appellant herein as co-defendants, would the provision in section 768.81 limiting damages to the percentage of fault of each *528 be applicable? Should the applicability of section 768.81 be at the option of plaintiff?
I see the policy adopted by the legislature as being broader than the single accident scenario accepted by the trial judge. The policy applies anytime a plaintiff's ultimate injury is caused by multiple parties or multiple negligent events. The court in Healthsouth Sports Med. & Rehabilitation Center of Boca Raton, Inc. v. Roark, 723 So.2d 314 (Fla. 4th DCA 1998), clearly found that comparative negligence is not limited to those acts involved in the initial injury. There, plaintiff sued his rehabilitation service for malpractice in permitting his ankle to become infected and to require multiple surgeries. The court held it proper that defendant therein raised plaintiff's comparative negligence by continuing to smoke after he was advised that his smoking would affect his healing process.
Although the legislature certainly intended that its new public policy would limit the amount of damages which can be assessed against those who combine to cause a single accident to the percentage of fault of each defendant, it did not intend that its limitation on the doctrine of joint and several liability contained within the statute should be construed as authority for permitting one whose negligence causes a minor injury to also be responsible for additional damages resulting from injuries caused by a separate negligent act committed by another when the jury is able to apportion the percentage of fault of each. The law of Florida has historically recognized that those who commit separate acts of negligence causing determinable injuries are liable only for the damages caused by their negligence. It is only under the judicial concepts of joint and several liability and "confusion of damages" that one has ever been held responsible for damages greater than his negligence occasioned. Hence, in Gross v. Lyons, 721 So.2d 304 (Fla. 4th DCA 1998), Rev. granted, Table No. 94,201, 732 So.2d 326 (Fla.1999), it was held reversible error for the judge not to have instructed the jury that it should apportion the damages between the injuries received from the two accidents if reasonably possible, but that, if apportionment was not possible, the jury could find the one who caused the first injury responsible for all damages.
In Washewich v. LeFave, 248 So.2d 670 (Fla. 4th DCA 1971), the court held that where plaintiff was thrown from her car upon collision and was struck by defendant's approaching vehicle as she lay in the roadway, defendant could be held liable, where apportionment is impossible, for damages resulting from the first collision as well as for those resulting from being hit by defendant notwithstanding that defendant was responsible only for the second accident. Therefore, in Gross and Washewich, those responsible for committing serial acts of negligence causing injury, whether or not parties to the action, were effectively on the verdict form.
Actions against doctors, however, have been treated somewhat differently. In Stuart v. Hertz Corp., 351 So.2d 703 (Fla. 1977), the supreme court, because it did not then want to adopt a doctrine of partial equitable indemnification between active tortfeasors, denied the defendant the right to file a third-party action against an allegedly negligent doctor. Even though Stuart recognized that the defendant and the doctor were not joint tortfeasors but were distinct and independent tortfeasors, it nevertheless held that the negligence of the defendant was the proximate cause of the injuries allegedly inflicted by the doctor. Also, the negligence of the one who caused the collision in Washewich could be called the proximate cause of the injuries occasioned by the negligence of the second driver because it placed plaintiff in a position of risk. Since the Stuart court did not wish to permit the tortfeasor to complicate the personal injury action by interposing a claim of negligence on the part of a doctor, it denied the defendant the opportunity to attempt to apportion damages to others responsible for them.
*529 The supreme court in Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So.2d 702 (Fla.1980), has now rejected the notion that a negligent defendant cannot recover that portion of a judgment against him which he can show is attributable to the subsequent negligence of a doctor. And by enacting section 768.81, the legislature has determined that a single jury should decide the percentage of fault for each of those alleged to be responsible for appellee's damages. The underpinning of the concept of comparative negligence is that the court (the jury) has the ability to apportion damages in relation to plaintiff's injuries. See Walt Disney World Co. v. Wood, 515 So.2d 198, 202 (Fla.1987) (McDonald, C.J., dissenting).
Even before the enactment of section 768.81, Lloyds recognized that "distinct and independent tortfeasors" should ultimately be responsible for only the damages caused by their acts of negligence if such damages can be reasonably determined. Suppose, for example, a negligent driver runs over a professional musician causing irreversible nerve damage to his left elbow which will prevent the plaintiff from ever again playing the violin. Plaintiff is rushed to the hospital where a doctor, mistaking the patient for another, amputates the fingers on the right hand. Under appellee's theory, the driver would be unable to urge to the jury that although he might be responsible for damages relating to the loss of future income, he should not be liable for disfigurement. Obviously in this example the damages are easily apportionable. Then assume that there was a 30% percent chance that immediate surgery would have restored complete nerve function but because of the doctor's negligence this opportunity for recovery was lost. Should not the doctor be held to have contributed to the loss of future income as well as being responsible for disfigurement? Suppose the evidence excluded in this case would have shown that there is a 25% chance that the victim would have survived but for the negligent medical care. Under section 768.81, should the defendant herein pay 100% of the damages? Explain your answer.
The legislature has, by adopting section 768.81, clearly stated a public policy of holding one responsible only for the proportionate share of the damages resulting from his degree of fault. That is the real message of section 768.81. We should not look for loopholes in order to avoid applying this public policy. But even if we do hold that the public policy set out in section 768.81 applies only to those defendants who are jointly and severally liable, and even if we assume that such a statute is necessary to preclude holding one liable for damages caused by subsequent injuries inflicted by another's negligence (and I do not), still section 768.81 would apply in this case. While it may be true that the negligent defendant who causes an initial injury and the health care workers whose subsequent negligence causes additional injury are not jointly and severally liable as to plaintiff's entire claim (this is because even though the negligent defendant is liable for all damages suffered by plaintiff because he placed the plaintiff "at risk" of medical malpractice, the health care workers are liable only for the injuries caused by their malpractice[2]), they would be, but for section 768.81, jointly and severally liable for the injuries caused by the health care workersthe health care workers because of traditional negligence law and the negligent defendant because the law assumes that his negligent action was the proximate cause of the injury caused by the malpractice. Since both are responsible for the injury caused by the health care workers, and the damages which flow from such injury, they are joint tortfeasors as to this portion of the plaintiffs claim.[3]

*530 THE PROFFER

The majority's application of the Tipsy Coachman Rule is based on its view that even if the new public policy is broader than the single accident scenario so that liability is limited to the defendant's percentage of fault even in successive negligence cases, still defendant's proffer in this case was insufficient as a matter of law because there was not a showing of a "reasonable medical probability" that death would not have occurred even with prompt and competent medical treatment. Our record does not reflect what the proffer below was in relation to the alleged malpractice of the hospital and the doctors involved. Because of the outstanding summary judgment, a proffer was not required in any event.
First, we should consider the purpose of a proffer, which is to preserve for appeal an argument that the excluded evidence should have been admitted. See Jacobs v. Wainwright, 450 So.2d 200 (Fla.1984). The summary judgment before us was not based on the inadequacy of proof that others were responsible for a percentage of fault for plaintiff's injuries. Had it been shown that the medical care providers were in fact 90% at fault, the basis of the court's decision would not change: the health care workers still would not have been jointly and severally liable in the court's view. The proffered testimony was and is irrelevant to the issue of whether those who commit acts of negligence subsequent to the initial injury but which contribute to a greater injury should be added to the verdict form.
Second, it is at trial that the defendant has the burden of showing a non-party "contributed" to plaintiff's injuries. This case was resolved on summary judgment. Even though defendant attempted at trial to change the court's opinion by making a proffer, still the issue was resolved by a summary judgment not withdrawn. It is the movant who has the burden to negative or disprove the opposing party's position in order to obtain (or retain) a summary judgment. See Serchay v. NTS Fort Lauderdale Office Joint Venture, 657 So.2d 57 (Fla. 4th DCA 1995). Plaintiff simply did not do so in this case.
Third, even if inadequacy of proof was the basis for the summary judgment, and it was not, the question should not have been whether appellant proved that it would have been "more likely" that the victim would have survived had he received prompt medical care.[4] The question should have been whether the movant proved that the alleged negligence of the health care workers could not have contributed to Nathan's death. The movant did not make this showing.
The majority's holding that before health care malpractice can amount to actionable negligence there must be a showing that it would have "more likely" caused the injury (death in this case) is an astonishing proposition in a comparative negligence jurisdiction. Would that not limit any injury to a single cause? If the jury determines that plaintiff is 51% at fault, should the doctor walk? The basis for reasonable medical probability testimony in a comparative negligence jurisdiction is to determine if the injury is related to an alleged act (or acts) of negligence; it is not to determine which of the alleged acts of negligence is more likely to have caused the injury. For example, can it be said in Walt Disney that the plaintiff's injuries caused when her fiancé rammed *531 her vehicle from the rear at Disney's grand prix attraction, based on reasonable medical probability, resulted from Disney's 1% of fault? Healthsouth Sports Medicine demonstrates how testimony relating to medical certainty applies to comparative negligence when serial acts of negligence occur. In Healthsouth, the plaintiff broke his ankle and was treated by his doctor with the use of a metal plate and screws. When during rehabilitation the screws subsequently became exposed, infection required four additional surgeries. Plaintiff's healing process was complicated because he ignored medical instructions to quit smoking. There, the expert testified that there were three factors which contributed to the plaintiffs condition, the original injury, the treatment for that injury, and the smoking, all within a reasonable medical certainty. In our case, the question should not have been whether within reasonable medical certainty prompt and competent medical treatment would have saved the patient, it should have been whether within reasonable medical certainty the alleged medical malpractice was a factor, even a small factor, in the death.
Even though we have successive acts of negligence alleged herein, we have a single injury, death, to which the defendant contends the negligence of the ambulance company contributed when the ambulance went to the wrong hospital causing unnecessary delay, and by medical personnel because of inadequate treatment once the victim arrived at the hospital. It may well be difficult to prove that the negligence of others contributed to Nathan's death. The proffer indicates that near drownings may result in death regardless of medical treatment. But obviously many such victims survive. It would be the defendant's burden, at trial, to convincingly show a connection between delayed medical attention and death in near drowning cases. One method might be an epidemiological study of the percentage of those who successfully respond to prompt and competent medical treatment and those that do not. A design for an analysis of the effect of delayed medical treatment, assuming other factors can be eliminated, might be the following:
 Defined Population
 The number of near drowning victims admitted to
 area hospitals within the past three years.
The number of those who received The number whose medical care
medical care within 45 minutes. was delayed for over 45 minutes.
 (A) (B) (C) (D)
The percentage The percentage The percentage The percentage
 who perished. who survived. who perished. who survived.
If prompt medical care does affect the mortality rate of near drowning victims, then one would expect that (B) would be greater than (D). If it is sufficiently greater, then one might conclude that a delay of more than forty-five minutes "more likely" contributed to the death. If there is no appreciable difference, then the case against the ambulance personnel was not proved.
Even if actionable negligence is not proved against the ambulance personnel, what about the hospital and the doctors? Cohort studies[5] indicate that there is little *532 likelihood that a near drowning when the victim is submerged for less than five minutes will result either in death or survival with neurologic impairment.[6] A duration period of CPR for less than ten minutes is another favorable factor in recovery. In our case, Nathan was submerged for less than a minute and was revived on site after the lifeguard administered "only 2-3 breaths". An indication that the incident may prove fatal or lead to neurological impairment, in addition to lengthy submersion and an extended period of resuscitation, is whether the victim is comatose on arrival at the emergency room. Consciousness upon admission to the hospital is a strong indicator of survival. Nathan arrived at the hospital fully alert.[7]
I do not know why Nathan's near drowning resulted in his death. Nor does the majority herein. Nor did the jury that returned the verdict below because it was denied the opportunity to consider the effect of negligence, if any, of others. Something caused Nathan's episode to end differently than the studies indicate should have been the case. What pushed Nathan from the predictable safe area to his tragic consequence? Does one who suffers a seizure swallow more water in 15 seconds than one without a seizure swallows in five minutes? I do not pretend to know the answer but, I submit, inquiring minds should want to know. In my view, the defendant should have been given the opportunity to show, under either section 768.81 or under the holdings of Gross and Washewich, if it could, that negligence of others contributed to Nathan's death.
I agree that plaintiff below properly proved both the negligence of appellant and the amount of damages suffered. I would therefore reverse and remand for a new trial only on the issue of apportionment. Since the others alleged to be negligent are not parties, there is no due process problem. At this limited new trial, defendant would have the burden of showing that designated others bear a percentage of fault for Nathan's death. See Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262 (Fla.1996).
NOTES
[1] Section 768.81, Florida Statutes (1991), provides, in relevant part:

768.81. Comparative fault.
(1) Definition.As used in this section, "economic damages" means past lost income and future lost income reduced to present value; medical and funeral expenses; lost support and services; replacement value of lost personal property; loss of appraised fair market value of real property; costs of construction repairs, including labor, overhead, and profit; and any other economic loss which would not have occurred but for the injury giving rise to the cause of action.
(2) Effect of contributory fault.In an action to which this section applies, any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the claimant's contributory fault, but does not bar recovery.
(3) Apportionment of damages.In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability; provided that with respect to any party whose percentage of fault equals or exceeds that of a particular claimant, the court shall enter judgment with respect to economic damages against that party on the basis of the doctrine of joint and several liability.
(4) Applicability.
(a) This section applies to negligence cases. For purposes of this section, "negligence cases" includes, but is not limited to, civil actions for damages based upon theories of negligence, strict liability, products liability, professional malpractice whether couched in terms of contract or tort, or breach of warranty and like theories. In determining whether a case falls within the term "negligence cases," the court shall look to the substance of the action and not the conclusory terms used by the parties.
[2] We note that the studies referenced in the dissent were not considered by the trial court and are not a part of the record before us.
[3] We also note that, although an initial tortfeasor may be held liable for damages caused by a subsequent medical provider, the initial tortfeasor can file a separate claim against the medical provider. See Underwriters at Lloyds, 382 So.2d at 704.
[1] Because the court's summary judgment was based on its view that because the alleged health care workers were not jointly and severally liable they could not appear on the verdict form, the adequacy of the pleadings was not an issue. Certainly if the only problem had been that the individual health care workers were not named, defendant's motion to amend should have been granted. See Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262 (Fla.1996).
[2] But under the analysis of Washewich, if the damages cannot be apportioned, are not the health care workers liable for all damages?
[3] Black's Law Dictionary defines "joint and several liability" as follows: "A liability is said to be joint and several when the [plaintiff] may sue one or more of the parties to such liability separately, or all of them together at his option." "Joint tort-feasors" are defined as "[t]hose who act together in committing wrong, or whose acts if independent of each other, unite in causing single injury. Bowen v. Iowa Nat. Mut. Ins. Co., 270 N.C. 486, 155 S.E.2d 238, 242." Black's Law Dictionary 752-53 (5th ed.1979).
[4] Suppose appellee had joined the doctors and the hospital as defendants claiming their negligence contributed to Nathan's death. In order to avoid summary judgment, would plaintiff be required to prove that the alleged medical malpractice, based on reasonable undeniable certainty, "more likely" caused the death?
[5] Linda Quan and Dennis Kinder, Pediatric Submersions: Prehospital Predictors of Outcome, 90 Pediatric 909 (1992); William Graf, Peter Cummings, Linda Quan, and Daniel Brutocao, Predicting Outcome in Pediatric Submersion Victims, 26 Annals of Emergency Medicine 312 (1995); Gary Zuckerman, Patrice Gregory, Suzanne Santos-Damiani, Predictors of Death and Neurologic Impairment in Pediatric Submersion Injuries, 152 Archives of Pediatrics and Adolescent Medicine 134 (1998).
[6] It is true that these studies were not presented to the trial court. They were irrelevant to the issue of joint and several liability. They are extremely relevant, however, to the majority's Tipsy Coachman application.
[7] The emergency room physician testified that Nathan was "somewhat combative, somewhat confused, although I later learned that this was his normal functional status, as he had some mental problems."