876 So.2d 8 (2004)
Annie JACKSON As Personal Representative, etc., Appellant,
v.
YORK HANNOVER NURSING CENTERS, et al., Appellees.
No. 5D03-554.
District Court of Appeal of Florida, Fifth District.
May 7, 2004.
Rehearing Denied July 8, 2004.
*9 C. Samuel Newman and Jennifer Beltz-McCamey of Beltz Ruth Magazine Newman & Kohl, P.A., St. Petersberg, for Appellant.
Scott A. Mager, Gary S. Gaffney and Elaine J. LaFlamme of Mager & Associates, Ft. Lauderdale, for Appellees.
MONACO, J.
This appeal concerns the fact that the defendants below (the appellees in this court), York Hannover Nursing Centers, et al., and National Healthcare Corporation (collectively, "Nursing Home"), succeeded in having the Brooksville Regional Medical Center ("Medical Center"), placed on the verdict form that was sent to the jury as a Fabre[1] defendant. After the jury allocated fault between the Nursing Home and the Medical Center, the plaintiff below and appellant before us, Annie Jackson, as personal representative of Annie Johnson, deceased ("Personal Representative"), unsuccessfully moved the trial court for entry of a judgment notwithstanding the verdict so that she could recover the full amount of the verdict. In a nutshell, we are asked whether the Florida Supreme Court's holding in D'Amario v. Ford Motor Co., 806 So.2d 424 (Fla.2001), applies to the facts of this case. If D'Amario applies, an apportionment pursuant to Fabre was improper. We conclude, however, that D'Amario is not applicable, and affirm.
Annie Johnson was admitted to Brooksville Nursing Manor, a facility owned by the Nursing Home, on March 19, 1999, for rehabilitation following a stroke. She had previously been hospitalized and treated for her stroke at the Medical Center. The Personal Representative asserted that at the time Ms. Johnson was admitted to the facility owned by the Nursing Home she was not properly assessed for the risk of pressure sores and dehydration. According to the Personal Representative, Ms. Johnson continued to receive inappropriate care and treatment while at the Nursing Home, became severely dehydrated because *10 of a problem with malabsorption of liquids, and died three weeks after admission. The civil action was apparently brought pursuant to Chapter 400, claiming that the Nursing Home deprived Ms. Johnson of her statutory rights, and that the deprivation was the cause of her death.[2] The Nursing Home raised as an affirmative defense that the Medical Center was negligent in its care and treatment of Ms. Johnson prior to her admission to the facility operated by the Nursing Home, and that the Medical Center's negligence was responsible for the death of Johnson.
Before commencement of the trial the Nursing Home filed a Notice of Disclosure of Fabre Defendant in which it named the Medical Center as a non-party to be placed on the verdict form. At the conclusion of the trial the Personal Representative moved for a directed verdict on the Fabre defense as to the Medical Center. The Personal Representative argued that there was no testimony in the record indicating that the Medical Center did anything that had any effect on Ms. Johnson in connection with the theory of her case. The Nursing Home countered that while its own experts did not implicate the Medical Center, the Personal Representative's expert did.
The Personal Representative's expert testified that the Medical Center failed to complete an "Input-Output" form which would have identified the malabsorption problem and indicated that Ms. Johnson was dehydrated, an action that in his opinion fell below the standard of care. He further testified that a "transfer and continuity of care form" prepared by the Medical Center at the time Ms. Johnson was transferred to the Nursing Home's facility omitted information that would have apprised the Nursing Home of Ms. Johnson's dehydrated state and malabsorption difficulties, another action that fell below the standard of care. The motion for directed verdict was denied.[3]
Ultimately, the verdict form that went to the jury listed the Medical Center as a Fabre defendant. The jury in reaching its verdict assessed 75% of the negligence to the Medical Center and 25% to the Nursing Home. The Personal Representative filed a number of post-trial motions, including a motion for judgment notwithstanding the verdict, by which she sought to have a judgment entered against the Nursing Home for 100% of the verdict, based on the theory that apportionment of fault does not apply to enhanced injury cases. She argued that any condition of Ms. Johnson's that existed in the Medical Center prior to her admission to the Nursing Home's facility should be considered to be an "initial injury," and that any aggravation of that condition would be an "enhanced" injury. She cited D'Amario for support.
The Personal Representative also asserted that in order to be a Fabre defendant, the non-party defendant must be a joint participant in the act for which the damages are claimed. Since this was an action pursuant to Chapter 400, Florida Statutes (1999), and since section 400.023(1) allows only the licensee of a nursing home to be sued for damages resulting from deprivation and/or infringement of a resident's rights, the Personal Representative argued that the Medical Center could not be a joint participant. In other words, the Medical Center and the *11 Nursing Home could not be joint tortfeasors in a cause of action under Chapter 400.
Finally, the Personal Representative maintained that even if the Medical Center could be considered to be a non-party pursuant to Fabre, the Nursing Home failed to prove by a preponderance of the evidence all elements of the cause of action for negligence. She argued, essentially, that the nursing home failed to prove any fault on the part of the Medical Center in causing Ms. Johnson's injuries. The trial court concluded that D'Amario did not apply, and denied the motion for judgment notwithstanding the verdict.
In D'Amario an intoxicated person was driving a Ford automobile, and the plaintiff was a passenger. The driver lost control, and the car hit a tree. The vehicle then caught fire, and the plaintiff burned to death. At trial Ford blamed the impaired driver. The jury agreed, and a verdict was handed down in favor of the manufacturer. The plaintiff's motion for new trial was granted by the trial court, not because of the apportionment defense, but because the court concluded that it should not have admitted into evidence the driver's blood alcohol content. The district court of appeal reversed, indicating that Ford properly raised its apportionment defense. The Florida Supreme Court quashed the decision of the district court of appeal, however, and held that in cases dealing with the crashworthiness of vehicles, principles of comparative fault involving the causes of the first collision do not apply to the so-called "second collision." The fire caused by the lack of crashworthiness of the automobile was considered to be the second collision. Fabre, therefore, did not apply in crashworthiness situations, and apportionment of fault should not have been considered by the jury.
The high court then concluded that it was error to instruct the jury on comparative fault in connection with the cause of the accident, and that no party associated with the first crash could be on the verdict form to reduce the manufacturer's liability. The rationale was, basically, that jury confusion could result if the jury attempted to ferret out the liability for the underlying accident and injury, and try to factor in liability for the "second collision" or crashworthiness claim, as well. The Florida Supreme Court summarized as follows:
In such [crashworthiness] cases, the automobile manufacturer is solely responsible for the enhanced injuries to the extent the plaiiff demonstrates the existence of a defective condition and that the defect proximately caused the enhanced injuries. Thus, an automobile manufacturer who allegedly designed a defective product may not be held liable for damages caused by the initial collision and may not apportion its fault with the fault of the driver of the vehicle who caused the initial accident.
D'Amario, 806 So.2d at 441.
Interestingly, the D'Amario majority analogized a second collision case to a suit involving medical negligence that follows an initial negligently caused injury. In those circumstances the cause of the initial injury that necessitated medical assistance is not ordinarily considered to be a legal cause of injuries resulting from the later medical negligence of a medical care provider; and the initial wrongdoer is not considered to be a joint tortfeasor with the subsequent medical provider.
In other words, in cases involving medical malpractice, the cause of the underlying condition that brought the patient to the professional, whether a disease or an accident, is not to be compared to the cause of the independent enhanced injury *12 allegedly resulting from medical neglect.
D'Amario, 806 So.2d at 435.
Finally, the Court made this critical distinction:
[U]nlike automobile accidents involving damages solely arising from the collision itself, a defendant's liability in a crashworthiness case is predicated upon the existence of a distinct and second injury caused by a defective product, and assumes the plaintiff to be in the condition to which he is rendered after the first accident.... Thus, crashworthiness cases involve separate and distinct injuries  those caused by the initial collision, and those subsequently caused by a second collision arising from a defective product. We agree that when viewed in this light, crashworthiness cases may be analogized to medical malpractice cases involving a successive negligent medical provider who is alleged to have either aggravated an existing injury or caused a separate and additional injury.
D'Amario, 806 So.2d at 436-37 (emphasis added). It appears, therefore, that D'Amario only applies in Ms. Johnson's case if there were two distinguishable injuries, one caused by the Medical Center, and either a second separate and distinct injury caused by the Nursing Home, or an aggravation by the Nursing Home of an existing injury to Ms. Johnson originally caused by the Medical Center.
The limited record that we have of the proceedings below, however, indicates that both the Medical Center and the Nursing Home were dealing with a continuum of the same injury. The testimony reflects that Ms. Johnson was dehydrated while in the Medical Center; was still dehydrated when she left the Medical Center; and continued to be dehydrated during her days at the Nursing Home's facility. The trial court, in allowing damages to be apportioned by the jury in accordance with Fabre, concluded on the basis of the substantial competent evidence adduced at trial that there was only a single injury, and accordingly, that D'Amario did not apply. We think the trial judge got it right.
We are also unconvinced by the Personal Representative's argument that because section 400.023(1), Florida Statutes (1999), allows only the licensee of a nursing home to be sued for damages resulting from deprivation or infringement of a resident's rights, the Medical Center could not be a joint tortfeasor with the Nursing Home. Section 768.81, Florida Statutes (1999), deals with apportionment of damages, and in cases to which this particular section applies, the court must enter judgment against each party liable on the basis of each parties' percentage of fault, and not on the basis of the doctrine of joint and several liability (with an exception noted regarding economic damages). This section applies to negligence cases, including professional malpractice cases. In Fabre, the Florida Supreme Court interpreted the term, "party," to include all persons who contributed to the accident "regardless of whether they have been or could have been joined as defendants."
Here, the assertions against the Medical Center and the Nursing Home both sound in negligence. Moreover, both the trial court and this court have concluded that the Nursing Home and the Medical Center were joint tortfeasors, and were, accordingly, properly within the umbra of Fabre. The term "joint tortfeasors" is usually defined as two or more negligent entities whose conduct combines to produce a single injury. D'Amario, 806 So.2d at 435 n. 12 (citing Davidow v. Seyfarth, 58 So.2d 865, 868 (Fla.1952)); Association for Retarded Citizens  Volusia, Inc. v. Fletcher, 741 So.2d 520, 530 (Fla. 5th *13 DCA), review denied, 744 So.2d 452 (Fla.1999). To be joint tortfeasors each actor must have committed some wrong that results in an injury or damage to another. "Although there is but a single damage done, there are several wrongs." Phillips v. Hall, 297 So.2d 136, 139 (Fla. 1st DCA 1974)(Boyer, J., concurring specially). Even if two seemingly independent tortious acts do not "precisely coincide in time," the actors can reasonably be considered to be joint tortfeasors if the sequence of their tortious acts produces a single injury. See Leesburg Hosp. Ass'n, Inc. v. Carter, 321 So.2d 433, 434 (Fla. 2d DCA 1975).
Whether defendants are joint tortfeasors is ordinarily a question of fact determined by the circumstances of the particular case. Caccavella v. Silverman, 814 So.2d 1145, 1148 (Fla. 4th DCA 2002), review denied, 860 So.2d 976 (Fla.2003); Letzter v. Cephas, 792 So.2d 481, 486 (Fla. 4th DCA 2001). In the instant case, as we have noted, there is only one injury, that being the death of Ms. Johnson by malabsorption of liquids and consequent dehydration, and the jury saw fit to apportion the damages. Moreover, as we have earlier indicated, there was sufficient evidence produced reflecting that the Medical Center and the attending physician at the Medical Center acted in concert with the Nursing Home to cause the single injury. Under these circumstances we conclude that no error was committed by the trial judge in allowing an apportionment of the damages suffered by Ms. Johnson.
Finally, we do not address the issue raised by the Personal Representative regarding whether a cause of action for negligence was proved by the Nursing Home against the Medical Center. As we have not been furnished a sufficient record by the Personal Representative, we are obviously not able to confront this subject. See, e.g., Acosta v. Creative Group Invs., Inc., 756 So.2d 193 (Fla. 3d DCA 2000); Almodovar v. Almodovar, 754 So.2d 861 (Fla. 3d DCA 2000); Scarlett v. Scarlett, 736 So.2d 125 (Fla. 5th DCA 1999); Scotty's Inc. v. Olivieri, 713 So.2d 1020 (Fla. 5th DCA 1998); Hill v. Hill, 706 So.2d 406 (Fla. 5th DCA 1998).
While there are other issues raised by the Personal Representative, we conclude that none merit reversal.
AFFIRMED.
PETERSON and THOMPSON, JJ., concur.
NOTES
[1] Fabre v. Marin, 623 So.2d 1182 (Fla.1993).
[2] We say "apparently" because a copy of the complaint has not been provided to us in the record on appeal.
[3] We are unable to review the denial of the directed verdict because the Personal Representative failed to provide us with a complete transcript of the trial.