WELLS, Chief Judge.
Robert Jeffrey Chaskes, D.O., Sandra Saint-Eloi, A.R.N.P., and their employer Vohra Health Services, P.A., appeal from a final judgment in this medical malpractice action for the negligent treatment of a sacral decubitus ulcer (a bedsore). The defendant doctor and nurse treated then eighty-eight-year-old Dilia Jaquez over a period of- two weeks while she was at Miami Gardens Nursing Center following transfer from Memorial West Hospital where Jaquez had undergone surgery for a broken hip. During her stay at Memorial West, Jaquez developed the sacral ulcer which had deteriorated by the time she *481 was released to Miami Gardens to a stage IV bedsore.[1] On April 8, 2009, Gutierrez, as personal representative of Jaquez’s estate, bought suit claiming that Dr. Chaskes’s and Nurse Saint-Eloi’s care and treatment of Jaquez’s bedsore while at Miami Gardens fell below the standard of care and was a legal cause of damage for which they and Vohra Health were liable.[2] Gutierrez chose not to seek relief from Memorial West where the bedsore developed and initially deteriorated, nor from several of the other medical institutions or individuals which or whom subsequently treated Jaquez, but limited her claim to Dr. Chaskes, Nurse Sain1>-Eloi, and Vohra Health. The defendants alleged Gutierrez’s comparative fault and subsequently joined Memorial Hospital West and Miami Gardens Nursing Center as Fabre[3] defendants.
The case was tried before a jury in April of 2011. At the close of the evidence and shortly before the jury retired, the court below dismissed Memorial West from the action. Defendants’ motion for a directed verdict on proximate causation grounds was denied,[4] and the jury returned a verdict in Gutierrez’s favor apportioning fault 65% to Dr. Chaskes, 25% to Nurse Saint-Eloi, 0% to plaintiff Gutierrez, and 10% to Fabre defendant Miami Gardens Nursing Center. The jury awarded $13,000, for past medical bills and expenses and $337,000. for past pain and suffering, for total damages of $350,000. Defendants moved to set aside the verdict and enter judgment in accordance with their motions for directed verdict. Alternatively, defendants moved for a new trial or remittitur. The trial court denied the post-trial motions and entered a final judgment against defendants for $315,000 according to the jury’s apportionment of fault. A final judgment of $138,650 also was entered against the defendants for attorney’s fees and costs.
Because we agree with defendants’ position that Gutierrez failed to satisfy the standard established in Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1018 (Fla.1984), as to either this doctor or nurse, we reverse the final judgment rendered in Gutierrez’s favor and remand for entry of judgment in favor of Dr. Chaskes, Nurse Saint-Eoli and their employer Vohra Health. We also reverse the fees and costs order in Gutierrez’s *482 favor which followed the final judgment. This analysis makes it unnecessary to address the remaining points argued by the defendants.[5]

FACTS

On April 30, 2008, Dilia Dolores Jaquez, then age eighty-seven, fell and broke her hip. According to Gutierrez, before her fall, Jaquez had been reasonably healthy, living at home with Gutierrez, travelling alone long distances by air, and taking no medications.
Following her fall, Jaquez was transported to Memorial West Hospital and admitted for hip surgery. Although she tolerated the surgery well, she subsequently suffered a number of set-backs and generally deteriorated during her hospital stay. In addition to suffering from anemia, which required a blood transfusion, her white blood cell count shot up, she developed a urinary tract infection, hematuria (bloody urine), and acute renal failure. She also lost her appetite and was found to be suffering from significant erosive gastritis, a hiatal hernia, and duodenitis. Additionally, she was unable to engage in meaningful therapy to get back on her feet, and from time to time she became disoriented and confused. As one of her physicians noted the day before she was discharged, “[f]rom a functional standpoint ... [Jaquez’s] progress has been very slow. She still requires maximum assistance for bed mobility, total assistance with transfers, and standing balance is dependent.” In part because of this immobility, Coumadin, an anti-coagulant was prescribed to prevent “deep venous thrombosis ... and pulmonary embolism.”[6] She also developed a large pressure ulcer (bedsore) at the base of her spine which had deteriorated to stage IV by the time she was discharged from Memorial West to Miami Gardens on May 23, 2008.
At discharge, Memorial West prescribed for Jaquez, among other things, “continued wound care as [per] pressure ulcer protocol [with] Accuzyme[7] and Lyofoam[8], [and] cleans[ing] with normal saline daily.” Dr. Jesus Gonzales, Jaquez’s primary treating physician at Miami Gardens, ordered continuation of this treatment when Jaquez was admitted to Miami Gardens late in the evening on that same day. He also ordered a wound consultation with Vohra Health, an entity which provides wound care to nursing home residents. ■
The following day, Dr. Chaskes, a Vohra Health employee, ordered discontinuation of the Accuzyme treatment prescribed for Jaquez’s bedsore and prescribed instead Santyl,[9] a medication he found more effective for enzymatic debridement of bedsores. Dr. Chaskes also ordered contin *483 ued cleaning of Jaquez’s ulcer on a daily basis.
Two days later, on May 26, Dr. Chaskes and Nurse Sainb-Eloi (also a Vohra Health employee), visited Jaquez. By that time, Dr. Gonzales had noted that although the bedsore had no odor, it was producing a small amount of purulent[10] discharge. He also noted that the sore was not granulating[11] but instead was covered by dead tissue or slough. During their visit, Dr. Chaskes and Nurse Saint-Eloi surgically debrided the bedsore, applying a topical anesthetic (benzocaine) and using a scalpel to cut out dead muscle and other tissue. But because of the threat of excessive bleeding stemming from Jaquez’s anti-coagulation (Coumadin) therapy, they were unable to remove all of the necrotic tissue that they found and opted to treat the remaining small amount of necrotic tissue with enzymatic debridement (with Santyl) followed by removal of any remaining necrotic tissue at their next weekly visit. As before, they ordered daily cleansing of the sore, and to further promote healing, they ordered treatment with Mycolog, an anti-fungal agent, and packing with calcium alginate.[12] They also recommended a pressure mattress for Jaquez’s bed, that she be turned or repositioned every two hours, a gel cushion for her chair and that she be allowed to sit up no more than one hour at a time, all to lessen pressure on the sore.
Two days later, Jaquez was transported to the emergency room at Jackson Memorial Hospital to address a Coumadin overdose. While there, her sacral ulcer was evaluated and described to be much as it was when Dr. Chaskes and Nurse Saint-Eloi treated it on May 26. It had no odor although it was producing a moderate amount of purulent discharge. And while it still had some white/yellow slough, it had begun to show signs of granulation. No treatment of the ulcer was administered during Jaquez’s two day stay at Jackson Memorial other than dressing changes.
At 11:30 pm on the evening of May 29, after the two-day stay at Jackson Memorial, Jaquez was readmitted to Miami Gardens. By this time, she had become both bowel and bladder incontinent. On readmission to Miami Gardens, the orders previously issued by Dr. Chaskes for care of Jaquez’s sore were reinstated. And as before, nurses’ notes confirm that she was experiencing no pain.
On June 2, Nurse Saint-Eloi visited Ja-quez again. Anticipating a follow up de-bridement, Saint-Eloi had ordered administration of pain medication one-half hour before the procedure was to begin. When Saint Eloi examined the sore, she found it to have deteriorated. It now had an odor and was producing a large amount of exudate or discharge. She also saw that the skin around the wound was beginning to strip away.[13] Using a topical anesthetic (Benzocaine) and a scalpel as she had before, Saint-Eloi surgically removed necrotic subcutaneous tissue, necrotic muscle fascia, and slough from the bedsore, cutting *484 more deeply into the sore than she had before. When she was done, she applied Bactroban, an antibiotic powder effectively used in the treatment of MRSA[14] infections, and Santyl, and then packed the wound with calcium alginate. Because Ja-quez was already on a course of Bactrim, another powerful antibiotic, she did not request additional antibiotics but ordered application of Skin Prep[15] to the peri-wound area and continuation of the treatments for the sore that Jaquez had been receiving.[16]
Three days later, Jaquez’s daughter advised Miami Gardens staff that she wanted to remove Jaquez from the facility. She was told that removing her mother was against medical advice (AMA). Moreover, and despite Dr. Chaskes’s instructions that Jaquez was to sit in a chair for no more than one hour at a time, at the family’s request, Jaquez had been out of bed and sitting up for greater time periods.
When Saint-Eloi examined Jaquez on June 9, during her regular weekly rounds, she found that the bedsore had developed a pus pocket and was beginning to undermine.[17] She again surgically debrided the sore, once more cutting even deeper than before, draining the puss pocket and directly applying an antibiotic to the site. She changed the ongoing treatment to packing wet to moist with TABS[18] and indicated that if there was no improvement by the following week, another antibiotic, Augmentin, would be applied. Sitting again was limited to one hour per session with a gel cushion for Jaquez’s chair, and despite the risk of a urinary tract infection, Dr. Chaskes and Saint-Eloi recommended insertion of a Foley catheter to address Jaquez’s urinary incontinence to enhance healing of the bedsore.
Only three days later, on June 12, blood was noted in Jaquez’s urine. The following day she was transferred by ambulance to Jackson Memorial Hospital North where she remained until June 18, with a suspected gastro-intestinal bleed, gross he-maturia (bloody urine), and Coumadin toxicity. During this week-long stay in the hospital, Jaquez’s bedsore was evaluated daily. Each time, the evaluation was the same: the sore was a stage IV ulcer; the sore had a moderate amount of undermining and drainage; the sore had a yellow/white slough; the skin around the sore was macerated;[19] and the sore had no odor.[20] Measured on a scale of 0 to 10 (with 0 being none and 10 being the most severe), the pain from this sore was assessed by Jaquez at 2 — mild. During this stay, “no further breakdown” of the sore was noted and no treatment of the sore other than daily cleaning and dressing changes was administered. In fact, a wound care consult was not even request *485 ed until the day before Jaquez was discharged.
On June 18, Jaquez was discharged to her daughter’s home with orders to continue all existing medications except Couma-din. The following day she underwent a comprehensive adult nursing assessment for home health care services. That assessment detailed the condition of Jaquez’s stage IV sacral ulcer — noting that it had no odor — and found that Jaquez was experiencing no pain whatsoever. The only treatment recommended for the sore was cleaning with Kana Klenz,[21] packing with Aqua Gel,[22] and covering with 4x4 gauze. Jaquez’s daughter was also instructed to reposition Jaquez every two hours and to clean the sore with soap and water each time Jaquez’s had her diaper changed.[23] From June 19 through and including June 29, a registered nurse visited Jaquez at least once a day at her home. During these visits, the sore was cleaned with either Kana Klenz or normal saline and covered with 4x4 pads. While Gutierrez claimed her mother was suffering from the bedsore, each of the registered nurses providing care to Jaquez on a daily basis reported, as did all of her previous professional caregivers, that Jaquez had no pain.
On June 29, Jaquez was admitted to Aventura Hospital and Medical Center. The following day she was seen by a wound specialist who noted a stage IV sacral pressure ulcer with undermining, a large amount of yellow drainage, some skin erosion and some redness and maceration. The recommended treatment was virtually identical to that previously prescribed by Dr. Chaskes and Nurse Saint-Eloi. On July 14, Jaquez was sent home. The next day, Trinity Health Care Services conducted yet another assessment of Jaquez’s condition for the purpose of providing home health care services. This assessment determined Jaquez’s prognosis to be good to fair and again confirmed that Jaquez was in no pain. With regard to Jaquez’s bedsore, treatment was to be much the same as it had been in the past, cleaning with normal saline, application of silver sulfadiazine and packing with normal saline wet dressing.
On July 20, 2008, Gutierrez took her mother to the Dominican Republic to live with another of Jaquez’s daughters, a nurse. The caregiver service discharge at that point, indicated a six out of ten on a pain scale. On February 6, 2009, Jaquez died from gastro-intestinal bleeding, a cause totally unrelated to the bedsore. Two months later Gutierrez, bought her suit claiming that Dr. Chaskes’s and Nurse Saint-Eloi’s care and treatment of Ja-quez’s bedsore fell below the standard of care and was a legal cause of damage for which they and Vohra Health were liable.
No Proximate Causation as to Dr. Chaskes, D.O.
“To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed.” Gooding, 445 So.2d at 1018.
Dr. James Stern, a plastic surgeon -with no regular nursing home care experience testified as to the standard of care applicable to the treatment of Jaquez’s bedsore by Dr. Chaskes.[24] Dr. Stern’s testimony *486 was that Dr. Chaskes fell below the applicable standard of care for treatment of the bedsore when the bedsore was debrided on May 26 because only a topical anesthesia was utilized which precluded cutting deeply enough into the sore so as to remove all of the necrotic tissue in it:
[BY DR. STERN]. This debridement was done ... on an anticoagulated patient with inadequate anesthesia in an incomplete fashion. Not all of the necrotic tissue was removed.
According to Dr. Stern, the debridement had to be done under either a local or general anesthetic, and because Jaquez was on an anticoagulant, Coumadin, for her heart condition (atrial fibrillation), the anticoagulation should have been “reverse[d]” before debriding the sore or the procedure should have been conducted in the hospital where a blood bank was available. Ignoring the fact that Jaquez had just been released from a hospital following a three-week stay only a few days before Dr. Chaskes first saw her; that Jaquez was admitted to a different hospital only two days after Dr. Chaskes first saw her on May 26; and that Jaquez was readmitted to the second hospital again on June 13 — hospitalizations during which not one of her many caregivers ever suggested much less actually treated the sore as Dr. Stern suggested — Dr. Stern further opined that Dr. Chaskes fell below the applicable standard of care by failing to have her admitted to a hospital for treatment of the sore.[25]
While Dr. Stern did testify that Dr. Chaskes’s failure to comply with this standard of care resulted in infection of the bedsore, he did not testify that had Dr. Chaskes complied with this standard of care that the sore either would have healed or that it would have healed more quickly and without pain. To the contrary, on cross examination, Dr. Stern conceded that he could not predict within a reasonable degree of medical probability that his recommended procedure (or compliance with his described standard of care) would have resulted in a different progression of the wound or less pain for Jaquez:
Q. Next question, do you know whether or not if you had taken her to the operating room and done the procedure that you talked about instead of the one that was done by the Vohra Health Care team, whether or not her sacral ulcer would have progressed differently or caused her any less pain in the long run?
A. Again, I wasn’t treating her, so again, that would be a guess. I would hope that it would promote healing by cleaning the wound out, but that would be, you know, my expectation, but 7 could not say for certainty.
Q. We’re not talking about certainty. Page 70, help refresh your recollection. Under oath, you testified many times before, you’re ready to testify in this case—
A. Yes.
*487 Q. And you knew I was coming to take your deposition testimony to get your opinions for trial?
A. Yes.
Q. Okay. Question, line 15, “Do you know if you had taken her to the operating room and done the procedure that you indicated instead of the one that was done by the Vohra Heath Care team whether or not her sacral ulcer would have progressed differently or caused her any less pain in the long run?”
A. In the long run, you’re right. The answer is, no, that would be difficult to assess and I’ll stand by that.
MR. HARTZ: Excuse me, your Honor. I’d like to read the entire response he gave in his deposition.
[discussion, then deposition question read]

Q. “Do you know if you had taken her to the operating room and done this procedure you indicated instead of the one that was done by the Vohra Health Care team whether or not her sacral ulcer would have progressed differently or caused her any less pain in the long run?” Answer, “No, that would be difficult to assess.” Do you agree with that response?

A. Assess, yes.

Q. And you are of that same opinion today?

A. Yes.

(Emphasis added).
“Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiffs injury.” Gooding, 445 So.2d at 1019. “While some jurisdictions allow recovery for the loss of any chance for improvement, ... anything less than the more likely than not causation requirement in medical malpractice actions [is] improper.” Beisel v. Lazenby, 444 So.2d 953, 953 (Fla.1984). In this case, Jaquez’s medical expert admitted he could not say with reasonable, medical probability that the treatment he suggested, even if approved by Jaquez’s physicians in light of her other medical problems, could “cure” the wound, would cause it to heal more quickly, or would result in less pain. At best, all he could say was that his method provided Jaquez with the “best chance to heal”:
Q. My question is reasonable, medical probability. You would agree within a reasonable medical probability, you would tell a patient if you took him to the operating room to do the procedure you say should have [been] done in this case, you would not say within a reasonable medical degree of probability you could cure them; is that correct?
A. It is correct that I—
Q. Thank you.
THE COURT: One minute, [counsel].
A. That I cannot tell that it’s going to cure them in and of itself, but that is the best chance to heal the wound.
This was insufficient.[26] See Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Gon *488 zalez, 98 So.3d 1198, 1202 (Fla. 3d DCA 2012) (confirming that “[a] mere possibility of ... causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant” (quoting Gooding, 445 So.2d at 1018)).
Thus, while Dr. Stern’s testimony might support the conclusion that within a reasonable degree of medical probability Dr. Chaskes owed a duty to Jaquez and breached that duty, it cannot support the conclusion that this “breach” was the proximate cause of injury to Jaquez. See Cox v. St. Josephs Hosp., 71 So.3d 795, 799 (Fla.2011) (explaining that in Gooding, “the plaintiff brought a medical malpractice action, asserting that a hospital was negligent,” and observing “while the plaintiffs’ expert witness testified that the inaction of the emergency room staff violated accepted medical standards, the expert did not testify that immediate diagnosis and surgery would have, more likely than not, enabled Mr. Gooding to survive ... [thus] the defendant was entitled to a directed verdict because “the testimony established a no better than even chance for Mr. Gooding to survive, even had there been an immediate diagnosis of the aneurysm and emergency surgery.” (quoting Gooding, 445 So.2d at 1018)); Beisel, 444 So.2d at 953 (affirming a directed verdict issued in a defendant doctor’s favor and concluding “[i]n the ease under review the Beisels’ expert witness could not state that any of the treatments he recommended but which were not given by the defendant probably or more likely than not would have saved Mr. Beisel’s eye. To prevail he needed to do so and thus the district court correctly held the evidence supporting Beisel’s claim was insufficient to create a jury question on causation”); Hollywood Med. Ctr., Inc. v. Alfred, 82 So.3d 122, 125 (Fla. 4th DCA 2012) (“Because [the hospital] did not do any of the [identified] tasks, Nurse Cook testified that they breached the standard of care. What is missing here, as it was in Gooding, is the third element, namely whether the breach of that duty proximately caused the damages claimed.”); Wroy v. N. Miami Med. Ctr., Ltd., 937 So.2d 1116, 1118 (Fla. 3d DCA 2006) (“We understand that Wroy would rather have been diagnosed at the earlier mammogram, and that she is concerned about whether she received the correct treatment. However, Wroy failed to present any evidence that the defendants’ conduct resulted in a “more likely than not” chance of reoccurrence of the breast cancer or that because of the defendants’ alleged negligence, Wroy suffered any injury.”); Jackson County Hosp. Corp. v. Aldrich, 835 So.2d 318, 328 (Fla. 1st DCA 2002) (“The ‘more likely than not’ standard is satisfied ... if a plaintiff presents evidence that establishes that the decedent had a fifty-one percent or better chance that death would not have occurred but for the actions or lack thereof of the medical care provider. Rivet v. Perez, 655 So.2d 1169, 1171 (Fla. 3d DCA 1995).”).
Accordingly, a verdict should have been directed in Dr. Chaskes’s favor.
No Proximate Causation as to Sandra Saint-Eloi A.R.N.P.
As to Nurse Saint-Eloi, we likewise find Gutierrez failed to present sufficient evidence to create a question of fact under Gooding. See Gooding, 445 So.2d at 1018 (“To prevail in a medical malpractice *489 case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed.”). Thus, likewise, a verdict should have been directed in Nurse Saints Eloi’s favor.
Testifying as an expert for Gutierrez as to Nurse Saint-Eloi’s actions was Nurse Joyce Black, who holds a doctoral degree in nursing. The crux of Nurse Black’s testimony was that Saint-Eloi departed from the standard of care in failing to remove all the necrotic tissue from Ja-quez’s bedsore the first time it was debrid-ed on May 26, 2008. She focused on the May 26th procedure throughout her testimony, repeating in various iterations that “[t]his was a healable wound [had] it been cared for properly at the late stage of May.”
First, it is not clear whether it was Nurse Saint-Eloi or Dr. Chaskes who performed the May 26th debridement. What is clear is that Saint-Eloi was working side by side that day with her supervisor, Dr. Chaskes. Nonetheless, Nurse Black maintained that Saint-Eloi departed from the standard of care by not getting Jaquez into a hospital then and there to address her bleeding problems which in turn resulted in having to leave a small amount of necrotic tissue in the sore. This, again according to Nurse Black, led to an infection which led to non-healing.
Nurse Black concluded that as to the events of May 26, had a proper debridement been performed, Jaquez “had a good chance of healing.” Even if this language met the “fifty-one percent or better” standard,[27] it was not sufficient in this case, as at the May 26th debridement, Dr. Chaskes was there with Nurse Saint-Eloi. He signed off on all the notes for the visitation and procedure performed that day as did Saint-Eloi, and as Gutierrez concedes “[a]s her supervisor, Dr. Chaskes was responsible for Nurse Saint-Eloi and her treatment of Jaquez.”
According to expert Black, a proper de-bridement would have been with no Coum-adin or in a hospital with a blood bank setting. Even if Saint-Eloi had a different opinion as to the best way to proceed in the face of this stage IV bedsore, her supervising physician was with her, had actual knowledge of the patient’s condition, and did not recommend or advise hospitalization or termination of Jaquez’s anti-coagulation therapy but instead signed off on the procedure as that was performed.[28]
As previously stated, Dr. Stern, the expert as to Dr. Chaskes’s actions, opined that he could not say there was a better than even chance that had the procedure advocated been followed — a “full debridement” either in a hospital setting or following termination of anticoagulant therapy— the result would have been different. In sum, as to the events of May 26, there was *490 no testimony upon which a jury could conclude that because Nurse Saint-Eloi failed to comply with the standard stated by Black, Jaquez more likely than not, suffered the injuries alleged. As to that day’s events, the decision how to proceed lay with Dr. Chaskes, and the expert testifying as to his actions would not conclude that those actions more likely than not resulted in Jaquez’s injury.
As to Nurse Sainb-Eloi’s treatment of Jaquez after that date, Nurse Black’s testimony is much less definitive as to whether the breach alleged proximately caused the damages claimed. Questioned in this regard, her answers either referred back to what was done incorrectly on the 26th or were at best contradictory — stating at various points under questioning that the wound still could have been cured after that date or that it was too late to correct that initial mistake. More importantly, Nurse Black never indicated that her recommended procedure, done on either of those later dates, would have resulted in a better than even chance of the healing of the wound or alleviating the pain and suffering claimed.
While Nurse Black pointed to a number of things Nurse Saint-Eloi did wrong at her June 2nd and June 9th visits to Jaquez, she did not say that without those alleged deficiencies — failing to change antibiotics, failing to have a culture done, failing to properly chart what Saint-Eloi was doing and why — Jaquez would have had a better than even chance of improving. Without this critical last link in the chain of evidence demonstrating causation, there was no question for the jury to consider. See Simmons-Russ v. Emko, 928 So.2d 397, 398 (Pla. 1st DCA 2006) (“Because the appellant/cross-appel-lee’s expert testimony failed to satisfy the requirements of Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1020 (Fla.1984), as to the essential element of causation, we conclude that the trial court correctly entered a directed verdict and final judgment in favor of the appellee/cross-appellant.”).[29] Thus, a verdict should have been directed in Nurse Saint-Eloi’s favor.[30]
Conclusion
Because we conclude Gutierrez failed to satisfy the standard established in Good- *491 ing, as to either this doctor or this nurse, we reverse the final judgment rendered in her favor and remand for entry of judgment in favor of Dr. Chaskes, Nurse Saint-Eoli and Vohra Health. We also reverse the trial court’s award of attorney’s fees and costs to Gutierrez. See, e.g., Packaging Corp. of Am. v. DeRycke, 49 So.3d 286, 294 (Fla. 2d DCA 2010); Progressive Express Ins. Co. v. Menendez, 979 So.2d 335 (Fla. 3d DCA 2008); ARC Foods, Inc. v. MGI Props., 746 So.2d 514, 514 (Fla. 2d DCA 1999).
Reversed and remanded.

. The trial testimony was that, generally, a stage I pressure ulcer (or bedsore) is a condition where the skin is darker in pigmentation, warm, hard, and swollen; a stage II pressure ulcer is a condition where a superficial skin lesion has developed something similar to an abrasion, blister or small crater; a stage III pressure ulcer is a deep crater with damage or death of subcutaneous tissue; and a stage IV pressure ulcer is one with extensive destruction of the skin, tissue necrosis, or damage to muscle, bone, or supporting structures. See also NME Props., Inc. v. Rudich, 840 So.2d 309, 310 (Fla. 4th DCA 2003).

. Prior to the court granting defendants' motion to amend, defendants also had moved for partial summary judgment on, among other things, defendants' lack of involvement in the "initial development of [Ms. Jaquez’s] pressure wound.” At the pre-trial summary judgment hearing, the court granted that motion based on plaintiff’s counsel's agreement that plaintiff would not suggest in any way that the defendants "started” or "created” the ulcer, and the court granted a summary judgment holding that the defendants "did not create the ulcer.” At the start of the trial, the court instructed the voir dire jury panel that everyone agreed that "[defendants didn’t cause the wound.”

. See Fabre v. Marin, 623 So.2d 1182 (Fla.1993).

. See Sims v. Cristinzio, 898 So.2d 1004, 1005-06 (Fla. 2d DCA 2005) ("A motion for directed verdict should be granted only where no view of the evidence, or inferences made therefrom, could support a verdict for the nonmoving party.”).

. In addition to arguing that the defendants were not the proximate legal cause of Ja-quez's injury, defendants also argued the trial court erred in its ultimate decision that Memorial West should not be listed as a Fabre defendant, and that the $337,000 non-economic damage award was excessive.

. Upon admission to Memorial West, Jaquez had been diagnosed with onset atrial fibrillation which also is treated with anticoagulation therapy.

. Accuzyme is an enzymatic ointment used to chemically debride (remove or dissolve) nec-rcitic (dead, damaged or infected) tissue and to liquefy slough (dead tissue either white— with little bacteria present, yellow or green— with larger amounts of bacteria present, or brown — with hemoglobin from blood present) in lesions such as pressure ulcers.

. Lyofoam is a dressing (bandage) used to promote healing of exuding (oozing or discharging) wounds.

. The trial testimony was that Santyl permits a deeper debridement than Accuzyme and may be used with an antibiotic powder when infection is present.

. Purulent meaning pussy or oozy. See Purulent Definition, Merriam-Webster.com, http:// www.merriam-webster.com/medical/purulent (last visited Mar. 14, 2013).

. Granulation is the formation of cells which provide a base on which skin cells grow. See Granulation Definition, Merriam-Webster.com, http://www.merriam-webster.com/medical/ granulation (last visited Mar. 14, 2013).

. Calcium Alginate packing is a dressing (bandage) which absorbs exudate and provides a moist, cushioned healing environment for infected and non-infected wounds.

. This was described in Saint-Eloi’s notes as periwound excoriation.

. MRSA is an anachronism for methicillin resistant staphylococcus aureus, a bacteria highly resistant to many drugs. See MRSA Definition, Merriam-Webster.com, http://www. merriam-webster.com/medical/mrsa (last visited Mar. 14, 2013).

. A commercial skin cleanser.

. Dr. Chaskes and Saint Eloi had earlier requested daily testing of Jaquez's pre albumin level and that she receive daily vitamins.

. Undermining "signifies that the edges of the wound had separated from the underlying tissue.” Olsten Health Servs., Inc. v. Cody, 979 So.2d 1221 (Fla. 3d DCA 2008).

. TABS is an anachronism for triple antibiotic solution.

. This is a softening by moisture. See Macerate Definition, Merriam-Webster.com, http://www.merriamwebster.com/medical/ macerate?show=0&t= 1363276233 (last visited Mar. 14, 2013).

. The expert testimony indicated that odor may be a sign of infection.

. A commercial skin cleanser.

. A commercial lubricated pad.

. The assessment noted that Jaquez was both urinary and bowel incontinent.

.Dr. Stern was called to testify solely as to Dr. Chaskes’s treatment of Jaquez. It was agreed that he would not opine as to nurse Saint-Eloi’s performance, as that testimony would come in through a separate expert. *486 He had no opinion about development or treatment of the sore before Jaquez’s admission to Miami Gardens.

. Dr. Chaskes’s expert medical witness, Dr. Glenn Gedsig, an internist working exclusively as a geriatrician in nursing homes for the past ten years, testified that Dr. Chaskes’s treatment was appropriate and met the applicable standard of care based on Jaquez’s medical condition. More to the point, he testified that taking her off Coumadin would have subjected Jaquez to too great a risk of stroke, and that general anesthesia might have proven fatal to her, all of which was contraindicated for treatment of a relatively benign lesion.

. The expert testimony adduced in Olsten Health Services, Inc. v. Cody, 979 So.2d 1221, 1225 (Fla. 3d DCA 2008), demonstrates exactly that testimony missing as to Dr. Chaskes — a statement that more probably than not, the damages incurred were the result of the doctor's negligence:
Thus, Cuzzell testified that in her expert opinion, Nurse Edwards should have had a "one on one conversation with a physician, not an answering machine" when she noticed that the pressure ulcer was deteriorating, Cody was depressed, and his family was "overwhelmed." Cuzzell testified that Cody should have been "evaluated further for infection": Nurse Edwards breached the standard afeare by not “getftingj” him to a physician on or about November 21; *488 and if he had been seen by a physician and/or taken to an emergency room on November 21, the "fissure” (the almost-healed Stage 2 decubitus pressure ulcer) would not have progressed into a Stage 4 pressure ulcer, and therefore, Cody ‘‘would not have gone through the five plus years of suffering with a stage four fpressure ulcer].”
(Emphasis added).

. See Jackson Cnty. Hosp, Corp. v. Aldrich, 835 So.2d at 328 ("The "more likely than not” standard is satisfied ... if a plaintiff presents evidence that establishes ... a fifty-one percent or better chance that [the injury] would not have occurred but for the actions or lack thereof of the medical care provider.”).

. Nurse Black confirmed that the ultimate recommendation as to how to treat this patient belonged to the Vohra wound group:
Q: Now, we know that operative decision that we’re talking about, taking her in with potential blood transfusions, getting her off of Coumadin and all that stuff was something that you recommend. But that certainly wasn't recommended by anybody at that Miami Gardens admission, correct?
A. The people that would have recommended it would have been the Vohra wound group.
(Emphasis added).

. The deposition testimony of admitting physician Dr. Jesus Gonzalez Jr., read into the record at trial, confirmed only that he thought the treatment given throughout the time period at issue was "appropriate.”

. This analysis makes it unnecessary to reach the remaining two points argued by these defendants: one, that the trial court erred in dismissing Memorial West as a Fabre defendant, and two, that the verdict was excessive.
We nonetheless agree that Memorial West should have remained on the jury verdict form. Defendants’ expert, Dr. Glenn Gidseg, testified that the bedsore never should have developed and that Memorial West’s care and treatment of it fell below the standard of care. See Nash v. Wells Fargo Guard Servs., Inc., 678 So.2d 1262, 1264 (Fla.1996). "A ‘Fabre defendant’ is a nonparty defendant whom a party defendant asserts is wholly or partially responsible for the negligence alleged.” Salazar v. Helicopter Structural & Maint., Inc., 986 So.2d 620, 622 n. 1 (Fla. 2d DCA 2007); see also Chesterton v. Fisher, 655 So.2d 170, 172 (Fla. 3d DCA 1995); W.R. Grace & Co.-Conn. v. Dougherty, 636 So.2d 746, 747-48 (Fla. 2d DCA 1994).”); see, e.g., Jackson v. York Hannover Nursing Centers, 876 So.2d 8, 12 (Fla. 5th DCA 2004) (ruling that it was appropriate for the jury to consider the potential fault of the non-party hospital that provided treatment to the decedent prior to her admission to the nursing home because both facilities "were dealing with a continuum of the same injury.”).
We do not, however, agree that the amount of the verdict was excessive. Gutierrez testified that Jaquez suffered pain in her final months as a result of the bedsore. Defendants failed to show that the amount awarded was so inordinately large that it "exceed[ed] the maximum limit of a reasonable range.” *491 Bould v. Touchette, 349 So.2d 1181, 1184-85 (Fla.1977) ("In tort cases damages are to be measured by the jury's discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.”); Tsavaris v. NCNB Nat'l. Bank of Fla., 497 So.2d 1338, 1338 (Fla. 2d DCA 1986) ("An appellate court is not entitled to reverse simply on the basis that a decision of the trier of fact is against the weight of the evidence.”); Talcott v. Holl, 224 So.2d 420, 422 (Fla. 3d DCA 1969) (“A party who assails the amount of a verdict as being excessive, has the burden of showing it is unsupported by the evidence, or that the jury was influenced by passion or prejudice.”); Subaqueous Servs., Inc. v. Corbin, 25 So.3d 1260, 1268 (Fla. 1st DCA 2010) ("The party claiming an excessive verdict bears the burden to prove that the amount is not supported by the evidence or that the jury was influenced by matters beyond the bounds of the record.”); see also § 768.74, Fla. Stat. (2012).