# Third District Court of Appeal

## State of Florida

Opinion filed August 9, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2474
Lower Tribunal No. 09-92826
_____

## Rolando P. Ruiz, etc.,
Appellant,

vs.

## Tenet Hialeah Healthsystem, Inc., et al.,
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Jacqueline Hogan Scola, Judge.

Philip D. Parrish; The Gutierrez Firm, and Jorge P. Gutierrez, Jr., for appellant.

Chimpoulis, Hunter & Lynn, P.A., and Jonathon P. Lynn (Plantation); Hicks, Porter, Ebenfeld & Stein, P.A., Dinah Stein and Erik P. Bartenhagen, for appellees.

Before SUAREZ, EMAS, and FERNANDEZ, JJ.

FERNANDEZ, J.

Rolando P. Ruiz, etc., appeals from a final judgment entered in favor of appellees Tenet Hialeah Healthsystem, Inc. and Arturo Lorenzo, M.D., and the denial of his motion for reconsideration of the trial court's directed verdict in this medical malpractice action, or in the alternative, for a new trial. We affirm the trial court's entry of directed verdict in favor of Dr. Lorenzo because there is no competent, substantial evidence that Dr. Lorenzo caused the tragic death of Ruiz's wife.

Ruiz, the personal representative of the Estate of Maria Elena Espinosa, sued to recover damages for the death of his wife Espinosa who died of exsanguination during a surgical procedure to remove a cancerous tumor from her skull. Dr. Lorenzo is the anesthesiologist who conducted Espinosa's pre-anesthesia evaluation.[1]

Dr. Lorenzo declared in his sworn answer to an interrogatory that "[a]ll [he] did was [Espinosa's] anesthesia preparation evaluation." Dr. Lorenzo testified at trial that he saw Espinosa for three to five minutes after which Dr. Velazquez completed the evaluation. Dr. Lorenzo check marked a series of boxes on the pre-anesthesia evaluation. He signed the evaluation under the line marked "Physician"

[1] The defendants at trial included one internist, anesthesiologists Dr. Lorenzo and Dr. Guillermo Velasquez, and neurosurgeons Dr. Basil Yates and Dr. Pedro Albanes. The internist and Dr. Velazquez settled before trial. Dr. Yates, Dr. Albanes, and Dr. Lorenzo proceeded to trial. The jury returned a verdict against Dr. Yates and Dr. Albanes after which they settled. The jury assigned no liability to Dr. Velazquez.

2

and wrote the date and time. He told Dr. Velazquez that "[t]here is nothing, no major medical problems whatsoever. You may want to take a look at the EKG." Dr. Lorenzo saw the EKG, which was blurry but readable. The EKG reflected an abnormality. He told Dr. Velasquez that the EKG was blurry. Dr. Lorenzo neither advised Dr. Yates or Dr. Albanes that the EKG was blurry nor advised that it reflected an abnormality. Dr. Lorenzo testified that the abnormal EKG did not mean anything in light of the number of abnormal EKGs he saw on an average week. The history and physical well-being of the patient must be considered and Espinosa was one of the healthiest patients he had ever seen.

Dr. Lorenzo further testified that he never saw the protein level in Espinosa's urine. He reviewed only the first page of lab results. The remaining two pages of lab results included the results of Espinosa's urinalysis, which reflected an abnormal amount of protein in her urine. Dr. Lorenzo testified that, had he seen the protein level, he would have told Dr. Yates that he needed to "find out" why Espinosa was "spilling protein." Dr. Lorenzo testified that the protein level would not have affected his anesthetic.

Dr. Velazquez testified that he did a full evaluation on Espinosa from beginning to end after Dr. Lorenzo's evaluation. Dr. Velazquez completed and signed the anesthesia evaluation. He evaluated the EKG and all three pages of

3

Espinosa's lab results. He also made the determination that Espinosa could safely undergo general anesthesia.

Numerous other witnesses testified at trial. Dr. Yates and Dr. Albanes testified. Ruiz introduced the expert testimony of anesthesiologist Dr. William Mazzei, neurosurgeon Dr. Michael Joseph Chaparro, and Dr. Carlos Moreau, anesthesiologist and Medical Director at the hospital where Espinosa died. None of the expert witnesses testified that Dr. Lorenzo's evaluation of Espinosa fell below the standard of care such that any breach more likely than not caused Espinosa's death.

The trial court granted Dr. Lorenzo's motion for directed verdict, finding that there was no proof of causation. We agree with this conclusion.

A *de novo* standard of review governs the review on appeal of a trial court's decision to grant a directed verdict. Hancock v. Schorr, 941 So. 2d 409, 412 (Fla. 4th DCA 2006). The plaintiff in a medical malpractice case must establish (1) the standard of care the defendant owes; (2) the defendant's breach of the standard of care; (3) and that said breach proximately caused the damages claimed. Chaskes v. Gutierrez, 116 So. 3d 479, 485 (Fla. 3d DCA 2013). See also Hancock, 941 So. 2d at 412. "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." Chaskes, 116 So. 3d at 487; Hancock, 941 So. 2d at 412.

4

While all evidence must be viewed in a light most favorable to the non-moving party, the court can only rely on reasonable conclusions drawn from competent, substantial evidence upon which a jury could rationally rely in finding for the non-movant. Hancock, 941 So. 2d at 409. A review of the record in the light most favorable to Ruiz supports the trial court's conclusion on the issue of causation. There is no competent, substantial evidence at trial from which a jury could reasonably conclude that Dr. Lorenzo's behavior fell below the standard of care, or that any breach of the standard of care more likely than not caused Espinosa's death. It is undisputed that Dr. Lorenzo conducted a brief anesthesia evaluation on Espinosa and that he signed the anesthesia evaluation. The evidence is unequivocal that Dr. Velasquez completed the full anesthesia evaluation from beginning to end.

In addition, the record is devoid of competent, substantial evidence upon which to conclude that the blurry EKG or the abnormal protein level results caused Espinosa's death. The record reflects that no cardiac issues precluded Espinosa from undergoing safe anesthesia. Espinosa's autopsy revealed no evidence of coronary artery disease. The record is abundantly clear that the primary cause of Espinosa's death was exsanguination.

The trial court thus correctly granted Dr. Lorenzo's motion for directed verdict. We therefore affirm.

Affirmed.

SUAREZ, J., concurs.

EMAS, J., dissenting.

## **Introduction**

The question presented is whether the trial court erred in directing a verdict upon its determination that there was insufficient evidence for a jury to find that Dr. Lorenzo's negligence was a legal cause of Mrs. Espinosa's death. Viewing the evidence and all reasonable inferences in a light most favorable to Rolando Ruiz, personal representative of Mrs. Espinosa's estate, I conclude there was sufficient evidence upon which the jury could have found that the negligence of Dr. Lorenzo was a legal cause of the death of Mrs. Espinosa. In my view, therefore, the trial court erred in granting a directed verdict in favor of Dr. Lorenzo at the close of Ruiz's case, and I respectfully dissent.

> Established by Florida decisions so numerous as to preclude a need for their citation, are the rules that a trial court should not direct a verdict for defendant unless it is clear that there is no evidence whatever adduced that could in law support [] a verdict for plaintiff; and that an appellate court, on review of a judgment based on a directed verdict for defendant should consider the testimony adduced in the cause in the light most favorable to the plaintiff, disregarding conflicts in the evidence and indulging in the plaintiff's favor every reasonable intendment deducible from the evidence.

6

Hurst v. Krinzman, 237 So. 2d 333, 334 (Fla. 3d DCA 1970). See also Coba v. Tricam Indus., Inc., 164 So. 3d 637, 646 (Fla. 2015) (acknowledging: "A motion for directed verdict or JNOV should be granted only if *no view of the evidence could support a verdict for the nonmoving party and the trial court therefore determines that no reasonable jury could render a verdict for that party*") (citations omitted); Riedel v. Sheraton Bal Harbour Assoc., 806 So. 2d 530 (Fla. 3d DCA 2001). This standard applies equally to this court's review. Posner v. Walker, 930 So. 2d 659 (Fla. 3d DCA 2006).

More importantly, and pertinent to the issue in this appeal, "a directed verdict 'is not appropriate in cases where there is conflicting evidence as to the causation or the likelihood of causation.'" Friedrich v. Fetterman & Assoc., P.A., 137 So. 3d 362, 365 (Fla. 2013) (quoting Cox v. St. Joseph's Hosp., 71 So. 3d 795, 801 (Fla. 2011)).

The evidence at trial, viewed in a light most favorable to Ruiz, the nonmoving party, established:

**Discovery of the Tumor**

Sometime prior to May 2009, Mrs. Espinosa, a forty-five year old woman, developed a soft lump on the back of her head and she reported it to her primary care physician, Dr. Jorge Venereo. After obtaining a computerized tomography (CT) scan, Dr. Venereo referred Mrs. Espinosa to neurosurgeons Dr. Yates and Dr.

7

Albanes. Dr. Yates reviewed the CT imaging and advised Mrs. Espinosa that she had a two and one-half inch non-aggressive tumor in her skull, and recommended that it be removed as soon as possible.

Dr. Yates referred Mrs. Espinosa to a radiologist for a magnetic resonance imaging (MRI) study of her brain. After obtaining the MRI, Dr. Yates met with Mrs. Espinosa and advised her that she needed to undergo surgery to remove the tumor.

**Day of Surgery**

On the scheduled surgery date, after having been cleared for surgery by her primary care physician, Mrs. Espinosa arrived at Hialeah Hospital between 5:00 a.m. and 6:00 a.m. for her pre-anesthesia evaluation. The main responsibility for clearing a patient for surgery lies with the primary care physician and the anesthesiologist, and the purpose of the pre-anesthesia evaluation is to document the patient's condition for surgery, assess the patient's overall health, and uncover any hidden conditions that may affect or render the patient a poor candidate for surgery. Dr. Yates (Mrs. Espinosa's surgeon) testified that if the anesthesiologist does not clear the patient for surgery, he (Dr. Yates) would not go forward with the surgery.

**Dr. Lorenzo's Pre-Anesthesia Evaluation**

The pre-anesthesia evaluation consists of an examination and interview of the patient, review of the patient's medical records, including the patient's medical tests and evaluations such as EKGs, blood and urine tests. Although Mrs. Espinosa's surgery was assigned to anesthesiologist Dr. Velazquez, that doctor was running late at the time Mrs. Espinosa arrived at Hialeah Hospital. Therefore, Dr. Velazquez's colleague—Dr. Lorenzo—began Mrs. Espinosa's pre-anesthesia evaluation. After Dr. Lorenzo had already begun the evaluation (including an examination of Mrs. Espinosa and review of her records), Dr. Velazquez arrived, and he took over Mrs. Espinosa's evaluation. Mrs. Espinosa was ultimately cleared for surgery.

At trial, Dr. Lorenzo conceded that Mrs. Espinosa was his patient, and that he was the acting anesthesiologist for Mrs. Espinosa during the time he evaluated her for surgery. He also testified that regardless of any prior medical clearance provided by Dr. Venereo (her primary care physician), Dr. Lorenzo was ultimately responsible for medically clearing Mrs. Espinosa for surgery:

> Dr. Venereo can give me a certain amount of information, but I am the ultimate—I make the ultimate decision if the patient can have anesthesia or not. I really—I get the information Dr. Venereo gives me and then I evaluate the patient to see if she can go through the anesthesia. I am the one that makes that decision.

Dr. Lorenzo testified that "when I do a patient, it doesn't matter who sees the patient. I review everything from A to Z." Nevertheless, Dr. Lorenzo

conceded that he did not "review everything from A to Z" for Mrs. Espinosa. After evaluating her for approximately three to five minutes, Dr. Lorenzo told Dr. Velazquez "[t]here is nothing, no major medical problems whatsoever. You may want to take a look at the EKG." Dr. Lorenzo then signed the pre-operative evaluation form as the anesthesiologist performing the evaluation, and declaring that it was safe from Mrs. Espinosa to undergo anesthesia and surgery.[2]

**The Abnormal EKG: A "Red Flag"**

During his evaluation of Mrs. Espinosa, the evidence at trial, viewed in the light most favorable to Ruiz, established that Dr. Lorenzo asked Mrs. Espinosa a series of questions from the pre-anesthesia evaluation form, regarding her cardiac, respiratory, neurologic, hepatic and renal systems, made a number of notations, and checked the box labeled "negative" for each of these system checks.

---

[2] At trial, Dr. Lorenzo took the position that he did not actually perform the pre-operative evaluation, that he merely "began" it, and that the evaluation was actually performed by Dr. Velazquez. However, when asked in a pretrial interrogatory to describe his participation, Dr. Lorenzo admitted that "all I did was her anesthesia preparation evaluation." Further, Plaintiff's expert testified that an anesthesiologist's signature on the pre-operative form is very significant because it signals that "they're responsible for the pre-op evaluation of the patient." The Plaintiff's expert also opined that, while it was unusual to see the signatures of two anesthesiologists on the evaluation form, in his opinion, each doctor performed his own evaluation of Mrs. Espinosa. At the very least, this testimony created a disputed question of fact for the jury to resolve, and did not serve (and could not have served) as a basis for the trial court's decision to direct a verdict in favor of Dr. Lorenzo.

Dr. Lorenzo had Mrs. Espinosa's medical chart when he performed the pre-anesthesia evaluation. Her medical chart included three pages of pre-operative lab tests and results, as well as a pre-operative EKG. Dr. Lorenzo reviewed the EKG, which included both the raw test results and a written report. Dr. Lorenzo testified that although the EKG was "blurry" and "wasn't optimal," he could interpret it.[3] However, Dr. Lorenzo noted that the report was inconsistent with both his own examination and the history Mrs. Espinosa provided. Mrs. Espinosa reported she had never suffered a heart attack, but the EKG report stated "probable right ventricular hypertrophy" and "high lateral MI" (myocardial infarction, or heart attack), as well as other abnormalities indicative of a possible prior heart attack. The EKG itself also indicated that it was an "Abnormal EKG."

Dr. Lorenzo acknowledged that an abnormal EKG report is an immediate red flag because cardiac issues are important when administering anesthesia. Dr. Lorenzo could have ordered another EKG, which could have been completed in fifteen to twenty minutes, would have been higher quality than the one he was provided, and would not have inconvenienced the surgeons. Nevertheless, Dr. Lorenzo did not order another EKG. And although he testified that EKG report "caught [his] eye" because it was "not normal at all," he stated that the abnormal

---

[3] However, this testimony conflicted with his deposition, during which he testified that he "couldn't see what was on [the EKG]."

EKG finding on the report "doesn't matter," that he felt comfortable with the EKG, and he wanted to save Mrs. Espinosa the additional expense of another EKG.

This position was contradicted not only by Plaintiff's expert, but by Dr. Moreau, the Medical Director of Hialeah Hospital, who testified that a patient should not be taken to surgery with an abnormal EKG, and that the surgery in this case should not have proceeded until the abnormal EKG and Mrs. Espinosa's cardiovascular history were reconciled.

**Abnormal Urine Test: Another "Red Flag"**

In addition, although Mrs. Espinosa's medical records included three pages of pre-operative lab tests and lab results, Dr. Lorenzo reviewed only the first page, and only "quickly took a look at the hemoglobin and hematocrit to see if she was anemic." Dr. Lorenzo noted a "red flag" regarding the hemoglobin and hematocrit levels in Mrs. Espinosa's blood, which he stated he did investigate. However, he did not look at the results of Mrs. Espinosa's urine test, which showed the presence of high levels of protein, another red flag requiring further investigation.[4]

Mrs. Espinosa's pre-operative urine protein level was 100 milligrams per deciliter. The presence of <u>any</u> protein in the urine is abnormal, and Mrs. Espinosa's urine protein level was (or should have been) a significant red flag for

[4] Plaintiff's expert testified, and even Dr. Lorenzo acknowledged, that protein in the urine is an abnormal finding, that he should have reported it to the surgeon, and had he done so, it was more likely than not that the surgery would not have occurred.

the anesthesiologist performing the pre-operative clearance. As Ruiz's medical expert testified, the tumor's appearance on the MRI, coupled with its slow growth, and the presence of protein in the urine, should have placed multiple myeloma at the top of the list of differential diagnoses, because seventy-five percent of patients suffering from multiple myeloma secrete protein into the urine. Dr. Lorenzo knew that Mrs. Espinosa was scheduled for surgery to remove a tumor from her skull. He also knew that a solitary non-aggressive tumor in the skull, together with protein in the urine, could be a sign of multiple myeloma, which ordinarily would not require surgery. Dr. Lorenzo acknowledged that, included in the lab results, was a urine test which showed the presence of protein in Mrs. Espinosa's urine. However, as Dr. Lorenzo conceded, he "missed" this lab result in his review of the pre-operative test results. Significantly, Dr. Lorenzo testified that, had he seen the test result of protein in the urine, he would have advised the surgeon about it. Most importantly, Dr. Lorenzo conceded that if either the abnormal EKG or the abnormal lab results had been brought to the surgeon's attention, more likely than not the surgery would not have taken place that day.

### Mrs. Espinosa Dies of Heart Failure

Mrs. Espinosa was taken in for surgery at 8:40 a.m., with Drs. Yates, Albanes and Velazquez. Mrs. Espinosa's heart began failing at about 8:45 a.m., before the actual surgery even began. At 11:44 a.m., Mrs. Espinosa was

pronounced dead on the operating table. On Mrs. Espinosa's death certificate, Dr. Yates, the neurosurgeon, filled out the death certificate and listed Mrs. Espinosa's cause of death as "heart failure". Dr. Albanes (the other neurosurgeon) testified his impression was that Mrs. Espinosa may have died of a heart attack.

**The Directed Verdict**

At the close of Plaintiff's evidence, Dr. Lorenzo moved for a directed verdict, asserting that Dr. Lorenzo did not perform or complete the pre-operative evaluation (but that it was instead performed and completed by Dr. Velazquez) and thus, as a matter of law, Dr. Lorenzo could not be held liable.

The trial court granted the motion for directed verdict, but for an entirely different reason, as evidenced by this discussion:

> **THE COURT:** Well, let me ask you something. And let's assume for a moment that Dr. Lorenzo did a preop evaluation. Let's just assume that's true, and let's assume he did it negligently, that he just didn't read the second page, ignored everything. What is the evidence of causation of your client's demise, which is, by the way, nothing short of a tragedy?

Plaintiff's counsel responded that it was, in part, Dr. Lorenzo's negligence which placed Mrs. Espinosa "in a position where she is exsanguinating" in surgery, to which the trial court responded: "So is the cab driver who drove her to the hospital."

The trial court again inquired of Plaintiff's counsel to point to the evidence "that shows he caused her death, other than if he had done all that, she would have been in surgery 20 minutes later. . . ."

Counsel responded:

> If [Dr. Lorenzo] reads the labs, Your Honor, she does not get cleared for surgery. Dr. Moreau [the Medical Director for Hialeah Hospital and an anesthesiologist] even testified today that based upon abnormal labs, he would have cancelled the surgery.

In fact, Dr. Lorenzo also admitted during his own testimony that if he had read all of the lab results and brought those results, or the abnormal EKG, to the attention of the surgeon, the surgery would not have taken place:

> **PLAINTIFF'S COUNSEL:** If you would have brought to someone's attention, either the EKG or the Labs, that surgery, more likely than not, doesn't take place because they need to reconcile the EKG and/or they need to reconcile the labs before the surgery, right?
>
> **DR. LORENZO:** Yes, Sir.

The trial court then granted a directed verdict, finding that even if Dr. Lorenzo was negligent in performing the pre-operative evaluation, there was no evidence that this negligence caused Mrs. Espinosa's death:

> I know all of the evidence, and there is nothing he did. I am going to assume for a second that he did a below standard of care eval. No. 1, he was not assigned to that room. No. 2, your own expert said, whoever comes in and does the surgery is themselves supposed to do it from jump street. So most respectfully, there is no proof of causation. There is speculation only, and I am cutting Dr. Lorenzo loose because the only thing worse than this woman's dying is having

15

somebody who shouldn't be held liable, held liable. This doctor is going home today.

The Plaintiff moved for reconsideration of the directed verdict and for a new trial. The motion was denied and this appeal followed.

**Analysis**

In this case, the trial court determined, upon a motion for directed verdict by Dr. Lorenzo, that there was "no proof of causation,"[5] and therefore, directed a verdict in favor of Dr. Lorenzo. For us to affirm, we must conclude that there is "no conflicting evidence as to the causation or the likelihood of causation." Friedrich, 137 So. 3d at 365; Aragon v. Issa, 103 So. 3d 887 (Fla. 4th DCA 2012). Dr. Yates, the neurosurgeon who performed the surgery, testified he would not have performed the surgery at that time if the anesthesiologist or the primary care physician had not cleared her. Therefore, the question is whether Dr. Lorenzo's alleged negligence "probably affected the outcome," Gooding, 445 So. 2d at 1018.

In this regard, the evidence presented at trial, taken in a light most favorable to Plaintiff, established five critical facts:

---

[5] In making its determination, the trial court assumed that there was sufficient evidence for a jury to find that Dr. Lorenzo's evaluation of Mrs. Espinosa fell below the standard of care. The only issue raised in this appeal is whether Plaintiff established causation as to Dr. Lorenzo.

16

1. Dr. Lorenzo signed the pre-anesthesia evaluation form, indicating he was responsible for performing the pre-anesthesia evaluation and indicating that, based upon his evaluation, Mrs. Espinosa was cleared for surgery;

2. Dr. Lorenzo was negligent in his review of the pre-operative test results, including his failure to clarify or reconcile the abnormal EKG, his failure to review or note the test results showing the presence of protein in the urine, and the failure to notify the surgeon of these issues;

3. If Dr. Lorenzo had brought to the surgeon's attention either the abnormal EKG or the abnormal lab results, it is more likely than not that the surgery would not have taken place.

4. A reasonably prudent anesthesiologist under the same circumstances would have notified the surgeon of these results and would not have cleared Mrs. Espinosa for surgery; and

5. Dr. Yates would not have performed the surgery that day had Mrs. Espinosa not been cleared for surgery, and thus Mrs. Espinosa would not have died on the operating table.[6]

---

[6] See Davidson v. Gaillard, 584 So. 2d 71, 73 (Fla. 1st DCA 1991) (noting that "when an original tortfeasor's negligent act causes a plaintiff to seek medical treatment which is negligently provided . . . negligent medical treatment is foreseeable as a matter of law.") (disapproved of on other grounds by Barth v. Khubani, 748 So. 2d 260 (Fla. 1999)).

The fact that Dr. Lorenzo was one of the two anesthesiologists who reviewed the EKG and lab results, who examined Mrs. Espinosa that morning, and who signed off on the paperwork clearing her for surgery that day, can only mean one thing: Dr. Lorenzo's negligence "probably affected the outcome."[7]

The fact that a second anesthesiologist (Dr. Velazquez) subsequently participated (allegedly negligently) in the pre-operative examination, or the fact that Dr. Yates and Dr. Albanes (the surgeons) were also negligent while performing the surgery[8], cannot support the trial court's action in directing a verdict in favor of Dr. Lorenzo. As the Florida Supreme Court held in Saunders v. Dickens, 151 So. 3d 434, 442 (Fla. 2014):

> Because the central concern in medical malpractice actions is the reasonably prudent physician standard, the issue of whether a treating physician acted in a reasonably prudent manner must be determined for each individual physician who is a defendant in a medical malpractice action. A subsequent treating physician simply may not be present at the time a defendant physician makes an allegedly negligent decision or engages in a potentially negligent act. Further, it is not only the final physician, but rather each treating physician who must act in a reasonably prudent manner. We hold that a physician cannot insulate himself or herself from liability for negligence by

---

[7] This case can thus be distinguished from Santa Lucia v. LeVine, 198 So. 3d 803 (Fla. 2d DCA 2016), where the Second District affirmed the trial court's granting of a directed verdict in favor of the doctor where there was no testimony that surgery would not have proceeded if a pre-operative consultation had been conducted. In the instant case, there was sufficient evidence of Dr. Lorenzo's negligence, as well as testimony that his negligence was a legal cause of Mrs. Espinosa's death.

[8] The jury found that Dr. Yates and Dr. Albanes were each negligent and that the negligence of each was a legal cause of Mrs. Espinosa's death.

18

presenting a subsequent treating physician who testifies that adequate care by the defendant physician would not have altered the subsequent care.

## **Conclusion**

Accordingly, I would hold that the trial court erred in directing a verdict in favor of Dr. Lorenzo, and would reverse and remand for a new trial on liability and damages as to Dr. Lorenzo. I therefore respectfully dissent.